*Cooley, Oh. J.:
The proceedings in this case were taken under “An act to revise and amend an act entitled ‘An act to encourage the erection and support of water power manufactories,’ approved March 21, 1865,” the amendatory act having been approved April 30, 1873. The second section of the act provides that “whenever any person shall desire to erect and maintain a water-power mill on his own land, or upon the land of another with his consent, or who has heretofore erected any such mill, or who shall desire to erect and maintain a dam on the same for the purpose of operating such mill by water-power, which dam flows or will flow water upon land belonging to any other, person, he may obtain the right to flow such land upon the terms and conditions and in the manner hereinafter set forth.”
The third section provides for proceedings in the probate or circuit court of the county for the appointment of commissioners, after failure to agree with the owner of the land as to the amount of damages to be paid. These proceedings are instituted by petition, which is required to “set forth the object and jiurpose of the petitioner, and that it is his intention in good faith to erect, construct and maintain, or to maintain if already constructed, a dam for the purpose of operating a water-power mill, particularly describing such mill, and whether it is for the public use.” It is also required to set forth a description of land flowed or to be flowed, and the names, residences, etc., of owners. The fourth and fifth sections provide for notice to parties and for a hearing on the petition. The sixth section regulates the action of the commissioners, and what their report shall contain, requiring them, among other things, to “ ascertain and determine the necessity for taking and using any such real estate or property for the purposes set forth in the petition, and whether the same is for public use.” The seventh section authorizes the summoning of a jury instead of *317 commissioners, when the same is demanded by either party, *and regulates the action and report of such jury. The eighth section provides for a hearing on the report, and the ninth makes the report, when confirmed and when payment of the damages awarded is made, conclusive of the right to flow. — Laws of 1873, Vol. I., pp. 486, 495.
Legislation of this sort is new in this state. It is true that in 1824 an act was passed by the territorial council “for the support and regulation of mills,” which purported to authorize any mill owner to flow the lands of other persons by his mill-dam, on the payment of an annual compensation assessed as therein provided. — Territorial Laws, Vol. 2, p. 192. But these provisions were repealed within four years. — Territorial Laws, Vol. 2, p. 699. And if any proceedings were ever taken under them while they remained in force, no record thereof remains so far as we know. Neither the statutes of 1838 nor those of 1846 contained any similar provision, though grist mills were regulated by both. Though in terms the act of 1824 was not expressly restricted to mills for the grinding of grain, it is probable that mills' of that description were alone contemplated by the council in passing it, as mills for other purposes are generally designated more specifically.
The repeal of the act of 1824 and the neglect for more than forty years to pass any other act of like character, afford weighty evidence that whatever' necessity might have been supposed to exist for such legislation in very early days, had wholly passed away in a very brief period. Nothing has occurred recently to create any necessity which has not existed at every moment since the act of 1824 was repealed. Indeed, the tendency of improvement has been in the direction of a steady diminution in the demand for water as a motive power for machinery. The adoption of the act of 1865 was not preceded by public discussions presenting its necessity, as would naturally have been expected when so great a change in the policy of the law was to be inaugurated, and the inference is admissible, if not forcible, that, like many general laws incautiously adopted, it had in view *some local or individual necessity, rather than any necessity *318 which then was or was afterwards expected to become general.
Unlike the act of 1824, the act of 1865 clearly appears to contemplate other mills than those for the grinding of grain. The title of the act would indicate a purpose to give every species of manufacture which could profitably be carried on by means of water-power the benefit of its provisions. In McClary v. Hartwell, 25 Mich., 139, in which proceedings under that act were in question, the purpose to be aided was a machine shop and foundry. It is true that the act, following the constitution in that particular, requires a finding by the jury or by commissioners that the proposed use is a “ public use;” but the fact remains that they are at liberty to find any use of water-power for the purposes of manufacture to be a public use, if in their opinion it will be beneficial. In this particular the statute is an anomaly, at least in the legislation of this state.
Statutes permitting lands to be thus taken for the purposes of water-power have been passed in some other states, and have been enforced. In Massachusetts they have received considerable attention, and have been sustained largely in reliance upon a general state policy evidenced by a long series of legislative enactments. — See Wolcott Woolen Manf. Co. v. Upham, 5 Pick., 294; Boston, etc., Mill Corp. v. Newman, 12 Pick. 467; Hazen v. Essex Co., 12 Cush., 477. In Maine the like considerations have supported them. — Jordan v. Woodward, 40 Me., 317. In New Hampshire the whole subject was very carefully considered in the case of Great Falls Manf. Co. 13. Fernald, 44 N. H., 444, and the taking of land for mill-dam purposes was justified on the ground that statutes existed for the purpose when the constitution was adopted, and it was reasonable to construe that instrument as permitting them. — See also Ash v. Cummings, 50 N. H,, 591. In Tennesee, Indiana, Connecticut and Kansas, such statutes have been considered sustainable on principle. — Harding v. Goodlet, 3 *Yerg., 41; Hankins v. Lawrence, 8 Blackf., 266; Olmstead v. Camp, 33 Conn., 532; Venard v. Cross, 8 Kan., 248; Harding v. Funk, Ibid., 315. In Wiscon *319 sin they have been sustained: Newcomb v. Smith, 1 Chand., 71; Thein v. Voegtlander, 3 Wis., 461; Pratt v. Brown, Ibid., 603; but it has since been declared that, if the question were new, and the court not embarrassed by previous decisions, a different conclusion would doubtless be reached. — Fisher v. Horicon Iron & Manf. Co., 10 Wis., 351, 353. In Georgia such statutes have been declared to be beyond the consitutional power of the legislature. — Loughbridge v. Harris, 42 Ga., 500. An eminent judge in New York has expressed a like opinion. — See Hay v. Cohoes Co., 3 Barb., 47. A like view has been taken in Alabama, though it was assumed in the case, that mills which were to grind grain for toll and were required to serve the public impartially might be aided by such statutes. — Sadler v. Langham, 34 Ala., 311. In Tyler v. Beacher, 44 Vt., 648, it was held that the taking of lands for mill-dams was not a taking for a public use, at least where the mills were not compelled by law to render service for the public under impartial regulations.
An examination of the adjudged cases will show that the courts, in looking about for the public use that was to be accommodated by the statute, have sometimes attached considerable importance to the fact that the general improvement of mill-sites; as property possessing great value if improved, and often nearly worthless if not improved, would largely conduce to the prosperity of the state. This is especially true of the decisions in those states where water power is most abundant, and where, partly because of a somewhat sterile soil, manufacturers have attracted a larger proportion than in other states, of the capital, skill and labor of the community. In this state it is doubtful if such legislation would add at all to the aggregate of property. Numerous fine mill-sites in the populous counties of the state still remain unimproved, not because of any *difficulty in obtaining the necessary permission to flow, but because the power is not in demand. If the power were needed, the land would generally be obtained on reasonable terms, except, perhaps, where there was ground to believe a dam would become a nuisance; and in such cases no permission to take lands, and no condemnation *320 for mill purposes, could protect the parties maintaining a dam against prosecution for the public grievance.
Whether the use to which the machinery is to be put which is to be operated by the power can be declared a public use, is the question that remains to be considered. If the act were limited in its scope to manufactures which are of local necessity, as grist-mills are in a new country not yet penetrated by railroads, the question would be somewhat different from what it is now. But even in such case it would be essential that the statute should require the use to .be public in fact; in other words, that it should contain provisions entitling the public to accommodations. .A flouring mill in this state may grind exclusively the wheat of Wisconsin, and sell the product exclusively in Europe;, and it is manifest that in such a case the proprietor can have no valid claim to the interposition of the law to compel his neighbor to sell a business site to him, any more than could the manufacturer of shoes or the retailer of groceries. Indeed the two last named would have far higher claims, for they would subserve actual needs, while the former would at most only incidentally benefit-the locality by furnishing employment and adding to the local trade.
Theré is nothing in the present legislation to indicate that the power obtained under it is to be employed directly for the public use. Any sort of manufacture may be set up under it, and the proprietor is not obligated in any manner to carry it on for the benefit of the locality or of the state at large. He is not bound to consider the interest of the locality or of the state; and nothing but the requirement that his project, whatever it is, shall receive from a commission or a jury a certificate to its public character, would ^preclude his devoting the' power to purposes which public opinion would not sanction. The statute appears to have been drawn with studious care to avoid any requirement that the person availing himself of its provisions shall consult any interest except his own, and it therefore seems perfectly manifest that when a public use is spoken of in this statute nothing further is intended than that the use shall be one that, in the opinion of the commission or jury, will in some manner advance the- *321 public interest. But incidentally every lawful business does this.
We are not disposed to say that incidental benefits to the public could not under any circumstances justify an exercise of the right of eminent domain. The rules which underlie taxation do not necessarily govern the case. Taxation is for those purposes which properly and legitimately are designated public purposes; but the authority of the state to compel the sale of individual property for the use of enterprises in which the interest of the public is only to be subserved through conveniences supplied by private corporations or individuals, has been too long recognized to be questioned. In such cases the property is not so much appropriated to the public use as taken to subserve some general and important public policy; and the difference between a forced sale for a reasonable compensation paid and a forced exaction without any pecuniary return, is amply sufficient to' justify more liberal rules in the former ease than in the latter.
If, however, the use to which the property is to be devoted were one which would justify an exercise of the power, it would still be imperative that a necessity should exist for its exercise. All the authorities require that there should be a necessity for the appropriation in order to supply some public want, or to advance some public policy; the object to be accomplished must be one which otherwise is impracticable.
What, then, is the necessity for the exercise of this extraordinary power in aid of manufacturing corporations ? It *is certainly not a necessity of the extreme sort which supports the like authority in aid of railways. A railway cannot run around unreasonable land-owners; but no one man and no number of men can prevent the establishment of a machine shop or a saw-mill by refusing to part with the lands they may happen to own. No particular motive power is indispensable. At the worst the question presented in any case will be a question of different degrees of convenience or of probable profits. A mill at one spot on a stream may be more profitable than at another; a machine shop at one point may be more cheaply operated by water *322 power than by steam power; but steam is not excluded from any part of the state because of any general conviction that water power is more advantageous or more economical. When the owner of a mill-site enters upon the calculation whether he shall improve the site in order to obtain operating power for machinery, or on the other hand provide steam machinery, the question that confronts him is not one of necessity, but of comparative cost, expense of operation and probable returns. Each course would have its advantages, and different minds would disagree concerning the choice to be made.
In considering whether any public policy is to be subseiwed by such statutes, it is important to consider the subject from -the standpoint of each of the parties. What may be eonwenience and economy for the mill-owner may be inconvenience ;and loss to his neighbor. Presumptively it always subjects a land-owner to inconvenience when his land is taken against ¡his will. It is reasonable to infer that he would part with it for a fair price if he were not to be subjected to annoyance or inconvenience in consequence. It is true he may unreasonably refuse to part with his land; and possibly motives of hostility and malice may induce him to put obstacles in the way of a proper enterprise. But, on the other hand, the opportunities for unreasonable or malicious action are not exclusively on one side. A mill-dam is not always an agreeable or wholesome neighbor; it ^sometimes brings blight to a neighborhood and discomfort and sickness to the people. The fear of such consequences might be the controlling motive in refusing consent to the flowing of lands; and 'the power to make compulsory appropriation, if admitted, might be exercised under circumstances when the general voice of the people immediately concerned would condemn it, though a jury drawn from the county at large might fulfill the technical requirement of the law by finding that the use for the proposed manufacture would be a “public use.” It is natural to assume that any new manufacturing establishment will be advantageous in the community; and in a general sense, if there were no drawbacks, this would be true; but the drawbacks are often so serious that it becomes a public nuis *323 ■¿nice. It would "be a singular, but by no means impossible, ■result of the condemnation of lands for a mill-dam, to find the dam itself condemned and ordered removed as a nuisance. That mill-dams often are nuisances, is not only well known, but the prosecutions for such nuisances make the fact a familiar one in our jurisprudence. Where the country is level, as is the case with a considerable part of this state, the ■danger that they will become nuisances is particularly great. And it is as fair to assume that the owner of a mill-site may be unreasonable and exclusively selfish in insisting upon an appropriation, as that the owner of the lands desired will be unreasonable and exclusively selfish in refusing to sell, but whether the One or the other is likely to be most unreasonable is not a consideration that can be conclusive. What seems conclusive to our minds is the fact that the questions involved are questions not of necessity, but of profit and relative convenience. It will scarcely be claimed that any single branch of industry is dependent, for either its establishment or support, upon the appropriation of property against the will of the owner in order to obtain water power.
Undoubtedly there may arise circumstances under which it would be convenient if a power to condemn lands for mill purposes might be exercised, but they are so rare that *a stretch of governmental power in order to provide for them would be more harmful than beneficial. It would under any circumstances be pushing the authority of government to extreme limits; and unless the reasons for it were imperative, would be likely to lead to abuses rather than tend to the promotion of the general interest, and to breed discords where, in the absence of such legislation, moderate counsels and final agreement might have prevailed. If in individual instances obstacles are encountered in the unreasonable objections of individual land owners, the rare instance cannot justify a general law which would be likely to breed as many grievances as it would cure, for legislation of this sort is always grievous when no great necessity justifies it; and it is always an invasion of liberty and of right when one is compelled to part with his possessions on grounds which are only *324 colorable. A person may be very unreasonable in insisting on retaining Ms lands; but half the value of free institutions consists in the fact that they protect every man in doing what he shall choose, without the liability to be called to account for his reasons or motives, so long as he is doing only that which he has a right to do.
For these reasons we think this statute without warrant, and that the proceedings under it cannot be supported. They will therefore be set aside, with costs of all the courts.
'The other justices concurred.
Campbell, J.:
I agree with the chief justice in the conclusion that the-statute providing for flowage is not a valid enactment. Assuming that there are cases in which water-power manufactories may be put under obligations of such a general character as in one sense to be of a somewhat public nature, this statute has not undertaken to declare what uses are thus to be regarded, and has left it to the mill-owner to *assert, and to the commissioners to find, any use to be public which they choose to regard as such. Under our constitution the necessity of taking the property for public purposes must be found in each case by the jury or commissioner's who appraise the damages, but this does not relegate to them the discretion of declaring what sorts of purposes are lawful. The legislature must indicate what sort of possible public purposes they are willing to have submitted to the process of an involuntary taking. Whether the particular improvement is so necessary as to justify the condemnation of lands is then a question for the appraising body.
But neither legislature nor jury can proceed to assert this' compulsion, even for purposes unquestionably deserving favor, unless necessary. And this necessity is not confined to the particular work in question. It may be impossible to erect a water mill on a given location without condemning lands above it. But whether the public interests will suffer so much from not having it there as to justify the condemnation of lands to aid it,, is a much more serious question.
*325 The general sense, at the present time, is, that mills are not within the scope of the jurisdiction to condemn private property in their favor. If cases arise in which such a jurisdiction would he proper, it is so exceptional, according to the general opinion, as to need support on very special grounds. And the question is fairly presented, whether under the constitutional authority of this state such legislation as the present is contemplated as proper. It is a principle which no respectable authority has ventured to deny, that property can never be condemned for private improvements, except where they ■belong to a class that cannot usually exist without the exercise ■of that power, and where the public welfare requires that they shall be encouraged. The improvements which unite both these conditions have been found in practice to be very few, and to be confined generally to some of the various kinds of roads or ways by *land or by water. In this state where lands are otherwise without beneficial access, this power under the constitution expressly covers private ways also, upon the simple principle that property which cannot be used as such is deprived of all its valuable attributes.
There can be no doubt of the importance of mills for grinding and for sawing to enable any civilized community to prosper, and as little doubt of the impropriety of making them public property, or building them at public cost. They are as necessary as roads and bridges, and if they could not be put in operation as a general thing without condemning lands for flowage, then the propriety of authorizing this might have been recognized. It is easy to see that there may be in some times and places, as there have been, instances calling for such authority and justifying it. Such was once the case in Michigan. But the history of that legislation is very conclusive in showing the understanding of our people when the present constitution was adopted. ■
In 1824 an act was passed by the territorial legislature “for the support and regulation of mills,” with the following preamble: “Whereas the erection and support of mills to accommodate the inhabitants of the several parts of the territory *326 ought not to be discouraged by many doubts and disputes, and some special provisions are found necessary, relative to flowing adjacent lands and relative to mills held by several proprietors; therefore be it enacted, etc.” The statute then proceeds to authorize steps to use lands in all "cases where-necessary to raise water to a suitable head, for any mill whatever; and the parties damaged were compelled to become moving plaintiffs, and required to have their damages assessed by an inquest made once or oftener, as they should choose.
This law was repealed in 1828. From that time up to 1S50-very many special acts were passed authorizing particular dams-to be .made and prescribing such locks, sluiceways or other conveniences as might prevent obstructions to the use of the streams for other purposes. Among all these *acts there were only two which provided for any flowing without the consent of land owners. Those two were passed in 1834 and 1835 concerning certain dams on Fox and Manitowoc rivers, in what is now Wisconsin. — L-1834, p. 69; L. 1835, p. 55. The state of Michigan never gave any authority to flow lands without consent until it was attempted in 1865 by the law superceded by that of 18Y3, now in controversy.
The original enactment, as well as the repeal of the law of 1824, can be readily understood, when considered in the light of the condition of the times, of which we must take judicial, notice.
The territory was then in a state of almost, complete isolation. Until the Erie canal was completed the expense of bringing steam machinery so great a distance would have been ruinous, and in the condition of the local roads it would have been impracticable. Emigrants were coming in rapidly and mills were necessary for their existence. Towns could not be maintained or even built without them. Water mills-were the only ones of any utility in such communities, and their necessity was urgent. They were undoubtedly as indispensable as roads, and in fact very commonly preceded them. The judgment of the legislature was in complete aecordancewith the facts.
*327 The condition in the then remote region of Wisconsin was not entirely different. The fact that the two statutes referring to that country differ so completely from all the rest adopted at the same time, is of itself evidence that there was some peculiar exigency which called for them. It is also to he remarked, that the right to build dams on the Fox and Manitowoc rivers was not in either case the sole purpose of the statutes, which seem to have contemplated them as but part of a system of improvements for the benefit of navigation and the establishment of business at the places named. The dams were only subsidiary.
The declaration of necessity of 1824 was no more significant than the finding that no further necessity existed in *1828, and this was no doubt owing to the introduction of steam. Any stream which is capable of furnishing water power is still more capable of furnishing water for running steam machinery; and any one who has the right to use running water at his steam mill is independent of riparian owners above him. Inability to get a right of flowage by means of a dam may destroy the value of land for a water mill, but does not even diminish it for any other purpose., And the community can not only get adequate milling facilities without it, but the location of mills can be made much more conveniently than when they could only be placed at certain points on the streams, which were not always adapted for towns or easy of access.
When the constitution of 1850 was adopted there had been for more than twenty years a consistent series of legislative declarations that no compulsory flowage was necessary. Such was the universally received doctrine in this state, and any statute to the contrary would have been questioned.
In considering the uses which are to be subserved by various improvements, we must regard their public character, referred to in the constitution, as it had been practically settled. There is no public necessity for accomplishing unnecessary results. The increase of settlements and the improvements in machinery are constantly diminishing the old difficulties instead of increasing them. The choice between steam and water power *328 is now one purely of private economy. The public can be supplied adequately at all events, and the occasional refusal of individuals to sell the right of flowage cannot drive any community into distress.
Any ruling which would now uphold the enforced servitude of private property to water mills would be in direct opposition to what was evidently meant when the constitution was adopted.
Marston J., concurred.