Weaver, J.
(concurring in part and dissenting in part). I concur with the majority’s result and decision to overrule Poletown Neighborhood Council v Detroit, 410 Mich 616; 304 NW2d 455 (1981), but do so for my own reasons.[1]
The Michigan Constitution states:
Private property shall not be taken for public use without just compensation therefor being first made and *486 secured in a manner prescribed by law .... [Const 1963, art 10, § 2.]
Proper application of the art 10, § 2’s “public use” limitation on the exercise of eminent domain requires that the Court abandon Poletown’s holding that land can be taken by the government and transferred to a private entity upon the mere showing that the economy will generally benefit from the condemnation. Thus, Wayne County’s attempt to use its eminent domain authority to transfer defendants’ properties to private developers to be included in a business and technology park violates the “public use” limitation of art 10, § 2 even though the park might benefit the region’s economy.[2]
I dissent from the majority’s holding that “public use” must be interpreted as it would have been by those “sophisticated” or “versed in the law” at the time of the 1963 Constitution’s ratification and from their application of that holding to the facts of this case. Unlike the majority, I would employ the long-established method of constitutional interpretation that restrains judges by requiring them to ascertain the common understanding of the people who adopted the constitution. The majority’s focus on the understanding of those “sophisticated in the law” is elitist; it perverts the primary rule of constitutional interpretation — that constitutions must be interpreted as the people, learned and unlearned, would commonly understand them. It invites the erosion of constitutional protections intended by the Michigan voters who ratified the 1963 Constitution.[3] The *487 majority’s approach ignores the words of Michigan’s respected jurist, Justice THOMAS M. COOLEY, who warned against the tendency to force from the Constitution, by “interested subtlety and ingenious refinement,” meaning that was never intended by the people who adopted it.[4]
I. CONSTITUTIONAL INTERPRETATION
Justice COOLEY’s often-cited description of the primary rule of constitutional interpretation bears repeating:
“A constitution is made for the people and by the people. The interpretation that should he given it is that which reasonable minds, the great mass of people themselves, would give it. ‘For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to he arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, hut rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.’ ” [Traverse City School Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley’s Const Lim 81 (emphasis in Traverse City School Dist).]
To ascertain the common understanding of the Constitution, the Court may also consider the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished by it. Traverse City School Dist, supra at 405.
*488 Contrary to Justice COOLEY’S warnings, the majority claims that the relevant “common understanding” by which we must interpret art 10, § 2 is that of those “sophisticated in the law at the time of the Constitution’s ratification.” Ante at 471. Until the majority’s decision in this case, this Court has never asserted that the term “public use” is a term of such “enormous complexity” that the people who ratified the Constitution would be unable to grasp its meaning.[5] This Court’s first reliance on the perspective of those “sophisticated in the law” was in Michigan Coalition of State Employee Unions v Civil Service Comm, 465 Mich 212; 634 NW2d 692 (2001). After appearing to acknowledge that constitutional language should be interpreted as it would have been understood by those who ratified it, the opinion asked, “Yet, what if the constitutional language had no plain meaning, but rather is a technical and legal term or phrase of art?” Id. at 222. Citing, out of context, a statement by Justice COOLEY regarding commonly understood technical or legal terms that must be supposed to have been employed in their technical sense,[6] the Court majority then erroneously equated such terms to words that are “in no way part of the common vocabulary.”[7] The Court majority next launched its unprecedented rule of constitutional interpretation:
*489 This, then, is the rule: if a constitutional phrase is a technical legal term or a phrase of art in the law, the phrase will be given the meaning that those sophisticated in the law understood at the time of the enactment unless it is clear from the constitutional language that some other meaning was intended. [Id. at 223.]
As in Michigan Coalition, the majority in this case claims to find support in Justice COOLEY’S treatise on constitutional interpretation, in which he wrote:
[I]t must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense.[8]
The majority takes this quote out of context and twists its meaning. When Justice COOLEY’S statement is returned to its full context, it neither supports nor justifies the majority’s abandonment of the people’s common understanding of constitutional terms for the understanding of those “sophisticated or learned in the law.”
As is revealed in the full text, Justice COOLEY sought to convey that certain constitutional terms have technical or legal meaning that is known to every person, learned or unlearned. Regarding such terms, COOLEY suggested that it is unnecessary for the Court to give them a more popular or plainer meaning. Careful attention is warranted to Justice COOLEY’S language that in context reads:
*490 In interpreting clauses we must presume that words have been employed in their natural and ordinary meaning. As Marshall, Ch. J., says: The framers of the constitution, and the people who adopted it, “must be understood to have employed the words in their natural sense, and to have intended what they have said.” This is hut saying that no forced or unnatural construction is to he put upon their language: and it seems so obvious a truism that one expects to see it universally accepted without question; hut the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to re-declare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government.
But it must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense. When the Constitution speaks of an ex post facto law, it means a law technically known by that designation; the meaning of the phrase having become defined in the history of constitutional law, and being so familiar to the people that it is not necessary to employ language of a more popular character to designate it. The technical sense in these cases is the sense popularly understood, because that is the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popidar rights.[9]
*491 This passage does not suggest that courts should defer to the understanding of those “learned or sophisticated in the law.” To the contrary, it simply affirms that certain legal and constitutional terms are so embedded in our constitutional law and history and their meanings so familiar to the people, that the court need not and must not attempt to redefine them. Clearly, Justice COOLEY does not suggest that the people’s common understanding of such terms be replaced by a “sophisticated” understanding that may be forced, by “interested subtlety and ingenious refinement,” from constitutional language.[10] But this is the very danger that the majority’s approach presents.
Justice COOLEY understood, as the majority refuses to accept, that the people do understand “the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights.”[11] By substituting the “learned and sophisticated” understanding for that of the people’s common understanding, the majority invites future judicial distortion of the Constitution, which was made by and for the people, and invites “interested subtlety and ingenious refinement” to “force from these instruments a meaning which their framers never held.”[12]
*492 Constitutional terms with commonly understood technical or legal meanings must, therefore, be distinguished from terms that have no meaning in the common vocabulary. For example, in Walker v Wolverine Fabricating & Mfg Co, Inc, 425 Mich 586, 596; 391 NW2d 296 (1986), the Court held that “[ajppeals... tried de novo” was a term that had no meaning in the common vocabulary. The Court noted that scholars disagreed and constitutional convention delegates expressed confusion regarding the term’s meaning.[13] Walker then explained the appropriate approach to the interpretation of such terms. In order to ascertain the common understanding, Walker stated:
First, one can look to the Constitutional Convention’s Address to the People for its explanation of an ambiguous term. Second, one can survey contemporaneous judicial decisions and legal commentaries for evidence of a consensus within the legal community regarding the meaning of a term.[14]
The process of ascertaining the meaning of terms in a constitution that are not part of the common vocabulary through a survey of judicial decisions reflects the rule that the “framers of a Constitution are presumed to have knowledge of existing laws, . .. and act in reference to that knowledge.”[15] However, the process of *493 ascertaining the understanding of the framers should not be confused with the process of ascertaining the understanding of the ratifiers.
Adhering to the common understanding of the ratifiers, as opposed to that of the “sophisticated in the law,” helps ensure that courts restrain themselves from substituting a different meaning of a word to suit a court’s own policy preferences. As Justice COOLEY so wisely noted, “Marrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government.”[16] It is perhaps for this reason that Justice COOLEY concluded that “[n]o satisfactory definition of the term ‘public use’ has ever been achieved by the courts.”[17]
II. THE PEOPLE’S COMMON UNDERSTANDING OF “PUBLIC USE”
From the ordinance for government of the Northwest Territory of 1787 to the Michigan Constitution of 1963, every document governing the state of Michigan has recognized the sovereign’s power of eminent domain.[18] In 1852, this Court noted that “ ‘the whole policy of this country relative to roads, mills, bridges and canals, rests upon this single power [of eminent domain] .. ..’ ”[19] Thus, eminent domain has long been *494 one of the “leading principles of government” that we must assume the people understood when they ratified each of Michigan’s constitutions.[20]
While eminent domain is an attribute of sovereignty,[21] “public use” is a limitation on the exercise of the power of eminent domain. In every Michigan constitution, the voters of Michigan imposed a “public use” limitation on the exercise of the power of eminent domain.[22] To ascertain the people’s understanding of art 10, § 2, it is to be remembered:
The primary source for ascertaining the meaning of a constitutional provision is to determine its plain meaning as understood by its ratifiers at the time of its adoption. This is so because “the constitution, although drawn up by a convention, derives no vitality from its framers, but depends for its force entirely upon the popular vote.”
Nevertheless, “to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered.” This Court cannot properly protect the mandate of the people without examining both the origin and purpose of a constitutional provision, because provisions stripped of their context may be manipulated and distorted into unintended meanings. Indeed we must heed the intentions of the ratifiers because our constitution gains its authority from its ratification by the people — to do otherwise deprives them of their right to govern. [Peterman v Dep’t of Natural Resources, 446 Mich 177, 184-185; 521 NW2d 499 (1994) (citations omitted; emphasis added).]
As clearly and fully expressed by this Court in Peterman, art 10, § 2, “has ‘acquired a well-understood *495 meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense.’ ”[23]
To clarify the meaning understood by the ratifiers of art 10, § 2, Peterman cited an 1857 case discussing the power of and limitations on eminent domain and in a footnote provided the following historical context:
Before the American Revolution and the drafting of the United States Constitution, the sovereign was not only-empowered to take private property for public use, but such takings were almost always uncompensated... . Nevertheless, the newly formed republic became increasingly hostile to governmental infringement of property rights as states seized loyalist lands, suspended or remitted debts and the collection of taxes, printed inflationary paper money, and delayed legal enforcement of property rights. To address these abuses was born the requirement that government may not take private property for public use without just compensation. [Id. at 187 n 14.]
Such historical perspective helps clarify the limitations on the exercise of eminent domain intended by the *496 ratifiers. Peterman’s approach is entirely distinct from the majority’s reliance on the “sophisticated” understanding of case law addressing the public use limitation. Peterman’s commitment to ascertaining the common understanding of the ratifiers stands in stark contrast to the majority’s statement that the people’s common understanding is “fictionalized.” Ante at 469-470 n 48.
Determining whether a particular exercise of eminent domain is for a constitutionally permissible “public use” has traditionally and necessarily involved consideration of the use to which the condemned property will be put. In 1877, this Court held that to constitutionally exercise the power of eminent domain, the use must “be public in fact; in other words, that it should contain provisions entitling the public to accommodations.”[24] Thus, this Court upheld the condemnation of land for the laying out of a public highway;[25] the condemnation of land for the opening of a public avenue;[26] a statute delegating condemnation authority to cities, villages, townships, and counties for the construction of airports;[27] and a public school district’s condemnation of property for use by the school.[28] In each of these cases the public retained the right to actually use the land.
A statute authorizing condemnation that merely requires the use of condemned property to generally serve the public interest is insufficient to justify the exercise of eminent domain authority because, “every *497 lawful business does this.”[29] It is thus well-established that the “public use” requirement precludes the condemnation of property for private use even if the private use will generally benefit the public.[30]
“The public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and due protection to the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another, on vague grounds of public benefit, to spring from the more profitable use to which the latter may devote it. [Portage Twp Bd of Health v Van Hoesen, 87 Mich 533, 538; 49 NW 894 (1891), quoting Cooley, Const Limitations (6th ed), p 654.]
This Court has held, therefore, that condemnation of land for a rail spur serving a single private company was an unconstitutional exercise of condemnation power because the private company could control its use and exclude the public.[31] Similarly, this Court has held that a statute authorizing condemnation of property to provide a private landowner access to his landlocked private property was unconstitutional.[32]
Ultimate private ownership of lands proposed for condemnation, however, does not necessarily render the taking of land unconstitutional under the “public use” requirement. This Court has upheld the exercise of eminent domain involving lands that remain in private ownership (albeit new private ownership) where the public retains the right to use the lands taken.
In every instance of turnpike, plank road, bridge, ferry, and canal companies, [eminent domain] has been employed, *498 as well as those of railroads. All this class of incorporations have been enacted upon the hypothesis that the lands taken for these purposes were taken for public use, and not for private endowment.... The right to purchase and hold lands for the purposes of the road, being a right delegated in virtue of the eminent domain of the government, and derogatory to those of the citizen whose property is condemned, must be construed as conferring no right to hold the property in derogation of the purposes for which it was taken. [Swan, supra at 439-440 (emphasis added).]
Thus, this Court upheld a statute providing for the appropriation of private property for a railroad designed to provide public travel[33] and a statute authorizing the condemnation of property for an interstate bridge available for public travel.[34] In these cases, ultimate private ownership of condemned land did not offend the “public use” limitation even though the owner would profit from its ownership, because the owner was and could be compelled to continue to devote the condemned land to the public use for which it was condemned.[35]
While this Court’s evaluation of whether a condemnation is for a “public use” has traditionally involved consideration of the public’s use or control over the use of the property condemned, this Court has considered the government purposes to be achieved by the condemnation. For example, this Court held the transportation of oil throughout the state to be a valid legislative purpose and upheld the constitutionality of a statute allowing the condemnation of lands for a pipeline to *499 serve that purpose.[36] There the Court concluded, however, that the pipeline was a “public use benefiting the people of the State of Michigan” and emphasized that the state retained control of the pipeline allowing it to ensure its devotion to public use.[37] The Court has also excused the absence of ultimate public use or control over lands taken and then transferred to a private entity in cases involving the removal of slums and blight that endangered public health, morals, safety, and welfare.[38] In these cases, the Court reasoned that “slum clearance is in any event the one controlling purpose of the condemnation.”[39]
Until Poletown, this Court’s decisions consistently distinguished “public use,” as that concept limits the exercise of eminent domain, from private uses and uses that only generally advance the public interest. This distinction was readily traceable in the law and must be assumed to have been well understood by Michigan citizens, the vast majority of whom are not lawyers and are not “sophisticated in the law.” The distinction between a “public use” and uses that are strictly private or only generally beneficial to the public protects against the arbitrary exercise of the “extraordinary” sovereign power of eminent domain.[40]
Wayne County’s purpose supporting each of the condemnation proceedings at issue is the creation of a contiguous land mass of approximately 1,300 acres for *500 the development of the Pinnacle Aeropark Project. The county states that contiguity is necessary to attract investors and further that the development will create thousands of jobs and tens of millions of dollars in tax revenue, while broadening its primarily industrial tax base.
However laudable these goals are, the facts remain that Wayne County intends to transfer these properties to private entities. These entities will be under no obligation to let the public in their doors or even on their lands. There is no way to characterize the county’s transfer of dominion over these properties as accommodating “public use.” Further, Wayne County will not retain control over the properties or enterprises to ensure their devotion to public use. Nor can it be said that a controlling purpose of the condemnations is the removal of blight or slums that endanger the public health, morals, safety, and welfare. This case is indeed a very straightforward example of government taking one person’s property for the sole benefit of another.
III. THE MAJORITY ABANDONS THE COMMON UNDERSTANDING
The majority’s application of its “sophisticated in the law” approach to this case is unnecessary and subject to abuse: it invites the erosion of the limitations placed on the exercise of eminent domain. As noted by Justice COOLEY, “[a] little investigation will show that any definition [of ‘public use’] attempted would exclude some subjects that properly should be included in, and include some subjects that must be excluded from, the operation of the words ‘public use’. . . ,”[41] Nevertheless, the majority opines that
*501 transfer- of condemned property to a private entity, seen through the eyes of an individual sophisticated in the law at the time of ratification of our 1963 Constitution, would be appropriate in one of three contexts: (1) where “public necessity of the extreme sort” requires collective action; (2) where the property remains subject to public oversight after transfer to a private entity; and (3) where the property is selected because of “facts of independent public significance,” rather than the interests of the private entity to which the property is eventually transferred. [42]
The majority’s categorization of Michigan case law addressing transfers of property to private entities is better suited to articles in law journals that have no force of law than it is to judicial opinions. If, instead of the common understanding of “public use,” future courts rely on “facts of independent public significance” to determine whether a condemnation is for a “public use,” then it is easy to imagine how the people’s limit on the exercise of eminent domain might be eroded. For example, a municipality could declare the lack of a two-car garage to be evidence of blight, as has been attempted in Lakewood, Ohio[43] or justify condemning a small brake repair business so that the property can be used for a hardware store, as has been attempted in Mesa, Arizona.[44] The majority’s “sophisticated in the law” approach makes the intended protections from such encroachments on protected rights less certain because it moves away from the constitutional text.
The majority’s categories are based on what the majority has determined is the “sophisticated” understanding of case law. However, “sophisticated” catego *502 rizations should not replace the traditional approach to ascertaining the common understanding of the ratifiers. Justice COOLEY aptly summarized the “public use” limitations as follows:
[T]he public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and due protection to the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another on vague grounds of public benefit to spring from the more profitable use to which the latter may devote it.
We find ourselves somewhat at sea, however, when we undertake to define, in the light of the judicial decisions, what constitutes a public use.[45]
Justice COOLEY’s scholarly treatise follows this statement with a review of judicial decisions from various states regarding the meaning of “public use” and concludes that “public use” “has a meaning much controlled by necessity, and somewhat different from that which it generally bears.”[46]
Contrary to the majority’s suggestion, Justice COOLEY does not justify invoking a cadre of legal “sophisticates” to help ascertain the meaning of “public use,” rather it reveals that “public use” is indeed a constitutional term that must be understood not in its “more popular character,” but rather in “the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights.”[47] The sense fixed upon the term in legal and *503 constitutional history is, in Justice COOLEY’S words, “familiar to the people.”[48]
The facts of each case involving a proposed condemnation should be considered in light of the “public use” limitation on the exercise of eminent domain as the limitation would have been commonly understood by the people, learned and unlearned, who ratified the Constitution. This ensures that the “sense fixed upon the words in the legal and constitutional history” continue to serve to protect the “popular rights.”[49]
Contrary to the majority’s suggestion, the people’s common understanding is not “fictionalized.” Ante at 470 n 48. The people who ratified art 10, § 2 do understand the limitations they imposed on the exercise of eminent domain. As stated by Justice COOLEY:
[I]t is always an invasion of liberty and of right when one is compelled to part with his possessions on grounds which are only colorable. A person may be very unreasonable in insisting on retaining his lands; but half the value of free institutions consists in the fact that they protect every man in doing what he shall choose, without liability to he called account for his reasons or motives, so long as he is doing only that which he has a right to do. [Ryerson, supra at 342.]
Nevertheless, the majority substitutes the people’s common understanding with that of those “sophisticated in the law.” Apparently, the current majority does not share Justice COOLEY’S respect for every person’s understanding of their most basic and established constitutional protections.
*504 IV CONCLUSION
I agree with the majority’s result and its decision to overrule Poletown. Poletown wrongly abandoned the express constitutional limitation on the exercise of eminent domain power when it held that land can be taken by the government and transferred to a private entity upon the mere showing that the economy will generally benefit from the condemnation. For the reasons stated by the majority, I agree that this decision should apply retroactively. Thus Wayne County may not condemn the properties of the defendants at issue.
I dissent from the majority’s reliance on its recently created and elitist rule of constitutional interpretation that gives constitutional terms the meaning that those “versed” and “sophisticated in the law” would have given it at the time of the Constitution’s ratification.
I also dissent from the majority’s application of this new rule to the facts of this case. While the majority’s application of its method of interpretation reaches the correct result in this case, this new rule of constitutional interpretation perverts the long-established and primary rule that constitutional terms are to be interpreted as they are understood by the citizen ratifiers, the vast majority of whom are not lawyers or judges and are not “sophisticated in the law.” The majority’s new rule of constitutional interpretation opens the door, as Justice COOLEY warned, for “interested subtlety and ingenious refinement” to be forced on the Constitution’s language — constitutional language that the people framed and adopted for themselves “as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government.”[50]
*505 Where a legal and constitutional term is so embedded in our constitutional law and history and so familiar to the people as to be commonly understood, this Court should not redefine it through the eyes of those “sophisticated in the law,” but should give it the common understanding that the people who ratified the Constitution would have given the term.
CAVANAGH, J., concurred only with respect to section I.

 I also concur in the majority’s reasoning for applying this decision retroactively.

 The public purposes achievable by public corporations through condemnation pursuant to MCL 213.23 must conform to the “public use” limitation of Const 1963, art 10, §2. Because the county’s public purposes extend well beyond the constitution’s “public use” limitation, the county may not condemn the properties at issue.

 As explained in Univ of Michigan Regents v Michigan, 395 Mich 52, 74-75; 235 NW2d 1 (1975) (citations omitted), when the people ratified *487 the 1963 Constitution, “the voters had before them the constitutional language and the explanatory ‘Convention Comments’ adopted by the delegates. Therefore, it is not the prerogative of this Court to change the plain meaning of the words in the constitution ‘as understood by the people who adopted it.’ ”

 1 Cooley, Constitutional Limitations (8th ed) p 131.

 Ante at 470-471 (citing Silver Creek Drain Dist v Extrusions Div Inc, 468 Mich 367, 375; 663 NW2d 436 (2003). In Silver Creek, the same majority of justices incorrectly held that the term “just compensation” in Const 1963, art 10, § 2 must be interpreted as those “sophisticated in the law” would have understood the term at the time of the Constitution’s ratification. I dissented because, “ ‘Ijjust compensation’ has long been readily and reasonably understood to he that amount of money that puts the property owner whose property is taken in as good, but not better, a financial position after the taking as the property owner enjoyed before the taking.” Silver Creek, supra at 384-385 (Weaver, J. dissenting in part).

 Id., citing 1 Cooley, Constitutional Limitations (8th ed), p 132.

 Id. at 223, citing Walker v Wolverine Fabricating & Mfg, Inc, 425 Mich 586, 596; 391 NW2d 296 (1986).

 1 Cooley, Constitutional Limitations (8th ed), p 132.

 Id. at 130-133(emphasis added).

 Id. at 131.

 Id. at 132-133.

 Id. at 131. The majority has also incorrectly invoked its new rule of constitutional construction to interpret Const 1963, art 1, § 14, calling “The right of trial by jury” a “technical legal phrase with the meaning those understanding the jurisprudence of this state would give it.” Phillips v Mirac, Inc, 470 Mich 415; 685 NW2d 174 (2004). Previously, in 1952, this Court took a much more straightforward approach to the same phrase when trying to determine whether a particular statute provided for a right to a trial by jury. Conservation Dep’t v Brown, 335 Mich 343, 346; 55 NW2d 859 (1952). The Court stated, “The statute under which these... proceedings were brought is silent on the subject of a jury. Michigan Constitution 1908, art 2, § 13, provides, as did Michigan’s *492 previous Constitutions, that ‘The right of trial hy jury shall remain.’ Thus the right to trial by jury is preserved in all cases where it existed prior to the adoption of the Constitution.” Conservation Dep’t, supra at 346. That the Court then considered the right as it existed in the common law before the ratification of the 1908 Constitution does not transform the ‘‘right of trial by jury” into a concept too complex for nonlawyers and nonjudges, who are the vast majority of the citizens of this state.

 Walker, supra at 598-599.

 Walker, supra at 596-597.

 Id. at 597 (citations omitted). See, also, Michigan United Conservation Clubs v Secretary of State (After Remand), 464 Mich 359, 417; 630 NW2d 297 (2001) (Weaver, J., dissenting).

 1 Cooley, Constitutional Limitations (8th ed), pp 131-132.

 2 Cooley, Constitutional Limitations (8th ed), pp 1139-1140 (emphasis added).

 See, e.g., 1787 Gov’t of Northwest Territory, art 2; 1805 Gov’t of Michigan Territory, § 2; Const 1835, art 1, § 19; Const 1850, art 15, § 9 and art 18, §14; Const 1908, art 13, §1 and § 5; and Const 1963, art 10, § 2.

 Swan v Williams, 2 Mich 427, 432 (1852), quoting Chancellor Walworth, 3 Paige R 73.

 1 Cooley, Constitutional Limitations (8th ed), p 132.

 Sinas v City of Lansing, 382 Mich 407, 411; 170 NW2d 23 (1969); Swan, supra at 431.

 Const 1835, art 1, § 19; Const 1850, art 15, § 9, §14; Const 1908, art 13, §1.

 Peterman, supra at 186 (quoting 1 Cooley, Constitutional Limitations (8th ed), p 132. The majority misuses Peterman to try to support the majority’s elitist holding that art 10, § 2 must be interpreted as it would have been by person’s “sophisticated in the law.” Read in context above, Peterman squarely acknowledged that art 10, § 2 has acquired a well-understood meaning, which the people must be supposed to have had in view. That “public use” might be called a technical term or term of art does not remove it from the understanding of every person. The majority’s perversion of the rule of common understanding is more than merely semantic. The majority’s approach invites “sophisticated” refinement of the people’s “right to govern” themselves through their popular vote. It allows the “sophisticated and learned in the law” to, intentionally or not, strip constitutional provisions of their context and manipulate and distort their meaning. See, e.g., Peterman, supra at 185.

 Ryerson v Brown, 35 Mich 333, 338 (1877).

 Rogren v Corwin, 181 Mich 53; 147 NW 517 (1914).

 In re Opening of Gallagher Ave, 300 Mich 309, 312; 1 NW2d 553 (1942).

 In re Petition of City of Detroit for Condemnation of Lands for Airport, 308 Mich 480; 14 NW2d 140 (1944).

 Union School Dist of the City of Jackson v Starr Commonwealth for Boys, 322 Mich 165; 33 NW2d 807 (1948).

 Ryerson, supra at 339.

 See, e.g., Pere Marquette R Co v United States Gypsum Co, 154 Mich 290; 117 NW 733 (1908).

 Pere Marquette, supra at 300.

 Tolksdorf v Griffith, 464 Mich 1, 9; 626 NW2d 163 (2001).

 Swan, supra. (Swan involved the interpretation of the eminent domain provisions of the United States Constitution and the Ordinance of 1787 governing the Northwest Territory.)

 Detroit Int’l Bridge Co v American Seed Co, 249 Mich 289; 228 NW 791 (1930).

 Swan, supra at 436, and Detroit Int’l Bridge Co, supra at 299.

 Lakehead Pipe Line Co, Inc v Dehn, 340 Mich 25, 36; 64 NW2d 903 (1954).

 Id. at 37 and 40.

 See, e.g., In re Slum Clearance, 331 Mich 714; 50 NW2d 340 (1951), Sinas v City of Lansing, 382 Mich 407; 170 NW2d 23 (1969), and City of Center Line v Michigan Bell Tel Co, 387 Mich 260; 196 NW2d 144 (1972).

 In re Slum Clearnace, supra at 72 (emphasis in original).

 Swan, supra at 433.

 2 Cooley, Constitutional Limitations (8th ed), pp 1139-1140.

 Ante at 476 (citing Poletown, supra at 674-681 [Ryan, J., dissenting]).

 Engage, Berman and Beyond: The Misuse of Blight Laws and Eminent Domain (Vol 5, Issue 1). See, also, CBS News, 60 Minutes, September 28, 2003.

 CBS News, 60 Minutes, September 28, 2003.

 2 Cooley, Constitutional Limitations (8th ed), p 1129.

 Id. at 1138.

 1 Cooley, Constitutional Limitations (8th ed), pp 132-133. A more “popular” sense of “public use” might be derived by concluding that the term required the public’s actual physical use of the land or by combining lay dictionary definitions of “public” and “use.” These definitions would *503 not necessarily reflect the full protections intended by the ratifiers of art 10, § 2 when they limited the exercise of eminent domain.

 1 Cooley, Constitutional Limitations (8th ed), p 132.

 1 Cooley, Constitutional Limitations (8th ed), pp 132-133.

 1 Cooley, Constitutional Limitations (8th ed), pp 131-132.