**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2004**

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                             No. 124070

EDWARD HATHCOCK,

    Defendant-Appellant.

---

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                             No. 124071

AARON T. SPECK and
DONALD E. SPECK, individuals,
    Defendants-Appellants.

---

COUNTY OF WAYNE,

    Plaintiff-Appellee

v                             No. 124072

AUBINS SERVICE, INC., DAVID R. YORK,
Trustee, David R. York Revocable Living Trust,

    Defendants-Appellants.

---

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                             No. 124073

JEFFREY J. KOMISAR,

     Defendant-Appellant.

---

COUNTY OF WAYNE,

     Plaintiff-Appellee,

v                                          No. 124074

ROBERT WARD and LELA WARD,

     Defendants-Appellants,

and

HENRY Y. COOLEY,

     Defendant.

---

COUNTY OF WAYNE,

     Plaintiff-Appellee,

v                                          No. 124075

MRS. JAMES GRIZZLE and
MICHAEL A. BALDWIN,

     Defendant-Appellants,

and

RAMIE FAKHOURY,

     Defendant.

---

COUNTY OF WAYNE,

     Plaintiff-Appellee,

v                                          No. 124076

STEPHANIE A. KOMISAR,

     Defendant-Appellant.

---

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                               No. 124077

THOMAS L. GOFF, NORMA GOFF,
MARK A. BAKER, JR., and
KATHLEEN A. BARKER,

    Defendants-Appellants.

---

COUNTY OF WAYNE,
    Plaintiff-Appellee,

v                               No. 124078

VINCENT FINAZZO,

    Defendant-Appellant,

and

AUBREY L. GREGORY and
DULCINA GREGORY,

    Defendants.

---

**BEFORE THE ENTIRE BENCH**

YOUNG, J.

We are presented again with a clash of two bedrock principles of our legal tradition: the sacrosanct right of individuals to dominion over their private property, on the one hand and, on the other, the state's authority to condemn private property for the commonweal. In this case, Wayne County would use the power of eminent domain to condemn defendants' real properties for the construction of a 1,300-acre business and technology park. This proposed

3

commercial center is intended to reinvigorate the struggling economy of southeastern Michigan by attracting businesses, particularly those involved in developing new technologies, to the area.

Defendants argue that this exercise of the power of eminent domain is neither authorized by statute nor permitted under article 10 of the 1963 Michigan Constitution, which requires that any condemnation of private property advance a "public use." Both the Wayne Circuit Court and the Court of Appeals rejected these arguments—compelled, in no small measure, by this Court's opinion in *Poletown Neighborhood Council v Detroit*.[1] We granted leave in this case to consider the legality of the proposed condemnations under MCL 213.23 and art 10, § 2 of our 1963 Constitution.

We conclude that, although these condemnations are authorized by MCL 213.23, they do not pass constitutional muster under art 10, § 2 of our 1963 constitution. Section 2 permits the exercise of the power of eminent domain only for a "public use." In this case, Wayne County intends to transfer the condemned properties to private parties in a manner wholly inconsistent with the common understanding of "public use" at the time our Constitution was ratified.

---

[1] 410 Mich 616; 304 NW2d 455 (1981).

Therefore, we reverse the judgment of the Court of Appeals and remand the case to the Wayne Circuit Court for entry of summary disposition in defendants' favor.

FACTS AND PROCEDURAL HISTORY

In April 2001, plaintiff Wayne County initiated actions to condemn nineteen parcels of land immediately south of Metropolitan Airport. The owners of those parcels, defendants in the present actions, maintain that these condemnations lack statutory authorization and exceed constitutional bounds.

This dispute has its roots in recent renovations of Metropolitan Airport. The county's $2 billion construction program produced a new terminal and jet runway and, consequently, raised concerns that noise from increased air traffic would plague neighboring landowners. In an effort to obviate such problems, the county, funded by a partial grant of $21 million from the Federal Aviation Administration (FAA), began a program of purchasing neighboring properties through voluntary sales. Eventually, the county purchased approximately five hundred acres in nonadjacent plots scattered in a checkerboard pattern throughout an area south of Metropolitan Airport.

Wayne County's agreement with the FAA provided that any properties acquired through the noise abatement program were to be put to economically productive use. In order to

fulfill this mandate, the county, through its Jobs and Economic Development Department, developed the idea of constructing a large business and technology park with a conference center, hotel accommodations, and a recreational facility. Thus, the "Pinnacle Project" was born.

The Pinnacle Project calls for the construction of a state-of-the-art business and technology park in a 1,300-acre area adjacent to Metropolitan Airport. The county avers that the Pinnacle Project will

> create thousands of jobs, and tens of millions of dollars in tax revenue, while broadening the County's tax base from predominantly industrial to a mixture of industrial, service and technology. The Pinnacle Project will enhance the image of the County in the development community, aiding in its transformation from a high industrial area, to that of an arena ready to meet the needs of the 21st century. This cutting-edge development will attract national and international businesses, leading to accelerated economic growth and revenue enhancement.

According to expert testimony at trial, it is anticipated that the Pinnacle Project will create thirty thousand jobs and add $350 million in tax revenue for the county.

The county planned to construct the business and technology park in a 1,300-acre area that included the five hundred acres purchased under the federally funded noise abatement program. Because the county needed to acquire more land within the project area, it began anew to solicit voluntary sales from area landowners. This round of sales

6

negotiations enabled the county to purchase an additional five hundred acres within the project area.

Having acquired over one thousand acres, the county determined that an additional forty-six parcels distributed in a checkerboard fashion throughout the project area were needed for the business and technology park. The county apparently determined that further efforts to negotiate additional voluntary sales would be futile and decided instead to invoke the power of eminent domain. Thus, on July 12, 2000, the Wayne County Commission adopted a Resolution of Necessity and Declaration of Taking (Resolution of Necessity) authorizing the acquisition of the remaining three hundred acres needed for the Pinnacle Project.

The remaining properties were appraised as required by the Uniform Condemnation Procedures Act (UCPA),[2] and the county issued written offers based on these appraisals to the property owners. Twenty-seven more property owners accepted these offers and sold their parcels to the county. But according to the county's estimates, nineteen additional parcels were still needed for the Pinnacle Project. These properties, owned by defendants, are the subject of the present condemnation actions.

---

[2] MCL 213.51 *et seq.*

In late April 2001, plaintiff initiated condemnation actions under the UCPA. In response, each property owner filed a motion to review the necessity of the proposed condemnations.[3] They argued, first, that the county lacked statutory authority to exercise the power of eminent domain in this manner. Second, defendants contended that acquisition of the subject properties was not necessary as required by statute. Finally, they challenged the constitutionality of these condemnation actions, maintaining that the Pinnacle Project would not serve a public purpose.

An evidentiary hearing on the consolidated cases was held over four weeks in the Wayne Circuit Court. On December 19, 2001, the trial court affirmed the county's determination of necessity. The court held that the takings were authorized by MCL 213.23, that the county did not abuse its discretion in determining that condemnation was necessary, and that the Pinnacle Project served a public purpose as defined by *Poletown*. The trial court denied defendants' motions for reconsideration on January 24, 2002.

Defendants appealed the matter to the Court of Appeals, which granted leave on April 24, 2003. The Court

---

[3] See MCL 213.56.

8

of Appeals affirmed the trial court's decision.[4]  The panel concluded that the proposed condemnations passed statutory and constitutional muster under MCL 213.21 *et seq.* and our *Poletown* decision.  Judge MURRAY, joined by Judge FITZGERALD, concurred with Presiding Judge O'CONNELL, but opined that *Poletown* was poorly reasoned, wrongly decided, and ripe for reversal by this Court.[5]

We granted defendants' applications for leave to appeal on November 17, 2003.[6]  Our grant order directed the parties to the following issues:

> (1) whether plaintiff has the authority, pursuant to MCL 213.23 or otherwise, to take defendants' properties; (2) whether the proposed taking, which are at least partly intended to result in later transfers to private entities, are for a "public purpose," pursuant to *Poletown Neighborhood Council v Detroit,* 410 Mich 616 (1981); and (3) whether the "public purpose" test set forth in *Poletown, supra,* is consistent with Const 1963, art 10, § 2 and, if not, whether this test should be overruled.  Further, the parties should discuss whether a decision overruling *Poletown, supra*, should apply retroactively or prospectively only, taking into consideration the reasoning in *Pohutski v City of Allen Park,* 465 Mich 675 (2002).

We also solicited briefs amicus curiae.

## STANDARD OF REVIEW

---

[4] Unpublished opinion per curiam, issued April 24, 2003 (Docket Nos. 239438, 239563, 240187, 240189, 240190, 240193-420195).

[5] Slip op at 5-6 (MURRAY, J, concurring).

[6] 469 Mich 952 (2003).

9

Statutory construction is a question of law subject to review de novo.[7]  In the eminent domain context, the UCPA limits our review of a public agency's determination that a condemnation is necessary.  We may vacate an agency's finding that a condemnation serves a public necessity only if a party establishes that the finding is predicated on "fraud, error of law, or abuse of discretion."[8]

Constitutional issues, like questions of statutory construction, are subject to review de novo.[9]

ANALYSIS

A. MCL 213.23

Defendants, the property owners whose lands Wayne County now seeks to condemn, assert that the proposed takings exceed the county's statutory and constitutional authority.  If it were correct that the county lacks statutory authorization to condemn defendants' properties, this Court need not—and must not, under well-established prudential principles—determine whether the takings also violate our Constitution.[10]  We begin, therefore, with the

---

[7] *Morales v Auto-Owners Ins Co (After Remand)*, 469 Mich 487, 490; 672 NW2d 849 (2003).

[8] MCL 213.56(2).

[9] *People v Nutt*, 469 Mich 565, 573; 677 NW2d 1 (2004).

[10] *Federated Publications, Inc v Michigan State Univ Bd of Trustees,* 460 Mich 75, 93; 594 NW2d 491 (1999) (CAVANAGH,

county's contention that MCL 213.23 authorizes the proposed condemnations.

MCL 213.23 provides:

> Any public corporation or state agency is authorized to take private property necessary for a public improvement or for the purposes of its incorporation or for public purposes within the scope of its powers for the use or benefit of the public and to institute and prosecute proceedings for that purpose. When funds have been appropriated by the legislature to a state agency or division thereof or the office of the governor or a division thereof for the purpose of acquiring lands or property for a designated public purpose, such unit to which the appropriation has been made is authorized on behalf of the people of the state of Michigan to acquire the lands or property either by purchase, condemnation or otherwise. For the purpose of condemnation the unit may proceed under the provisions of this act.

In interpreting this statutory language, this Court's primary goal is to give effect to the Legislature's intent.[11] If the Legislature has clearly expressed its intent in the language of a statute, that statute must be enforced as written, free of any "contrary judicial gloss."[12]

---

J., concurring in part and dissenting in part) (noting a "longstanding rule [that] requires us to consider constitutional questions only as a last resort, and to avoid such questions where a nonconstitutional basis exists for resolving the matter").

[11] *Morales, supra* at 490.

[12] *Id.*

Wayne County is a "public corporation" as the term is used in this statute,[13] and is therefore subject to the provisions of this section. Under MCL 213.23, a condemnation must be "necessary" for one of three ends: "a public improvement or for the purposes [to be advanced by the public corporation or state agency's] incorporation or for public purposes within the scope of [the corporation's or agency's] powers. . . ." Additionally, a proposed condemnation must be "for the use or benefit of the public. . . ."[14]

Plaintiff does not argue that the takings at issue are a "public improvement" or that they advance purposes of the county's incorporation. Consequently, this Court must determine only whether the proposed condemnations are *necessary* for *public purposes,* whether those purposes are *within the scope of the county's powers*, and whether the takings are "*for the use or benefit of the public . . . .*"[15]

1. "FOR PUBLIC PURPOSES WITHIN THE SCOPE OF ITS POWERS"

---

[13] Const 1963, art 7, § 1 ("Each organized county shall be a body corporate with powers and immunities provided by law."); MCL 213.21 ("The term 'public corporations' as herein used shall include all counties, cities, villages, boards, commissions and agencies made corporations for the management and control of public business and property . . ..").

[14] *Id.*

[15] MCL 213.23

12

Wayne County's assertion that the proposed condemnations are "for public purposes within the scope of its powers"[16] raises two discrete questions—first, whether Wayne County is authorized to exercise the power of eminent domain at all and, second, whether this particular exercise of the eminent domain power is within the county's powers.

There is no question that the *state* possesses the power of eminent domain.[17] The state's authority to condemn private property for public use is preserved by our Constitution[18] and has been expressly acknowledged by this Court on a number of occasions.[19] But whether that eminent domain power extends to counties within the state is another matter.

Plaintiff argues that the Legislature has expressly conferred that power upon public corporations such as Wayne County through the plain language of MCL 213.23. This statute begins by stating that "[a]ny public corporation or state agency *is authorized* to take private property

---

[16] *Id.*

[17] *Peterman v Dep't of Natural Resources,* 446 Mich 177, 185; 521 NW2d 499 (1994) ("[E]ach State by virtue of its statehood has the right to exercise the power of eminent domain."), quoting *Loomis v Hartz*, 165 Mich 662, 665; 131 NW 85 (1911).

[18] Const 1963, art 10, § 2.

[19] See, for example, *Peterman, supra* at 185-186, quoting *People ex rel Trombley v Humphrey,* 23 Mich 471, 474 (1871).

13

. . . ."[20]    Plaintiff argues that this language is a separate and independent delegation of the power to condemn private property for public purposes.    Because § 23 "authoriz[es]" public corporations to condemn property in certain circumstances, a public corporation need not rely on any other statutory provision in order to exercise the power of eminent domain.

Defendants maintain, however, that plaintiff's reading renders the second sentence of MCL 213.23 a nullity.    This sentence provides:

> When funds have been appropriated by the legislature to a state agency or division thereof or the office of the governor or a division thereof for the purpose of acquiring lands or property for a designated public purpose, such unit to which the appropriation has been made *is authorized* on behalf of the people of the state of Michigan to acquire the lands or property either by purchase, condemnation or otherwise.[21]

If the first sentence of MCL 213.23 is a separate grant of authority to condemn, defendants argue, the second sentence—which also confers the authorization to condemn land—is redundant.

A careful reading of MCL 213.23 reveals that this statute is indeed a separate grant of authority and, thus, that plaintiff has parsed this statute correctly.    The

---

[20] MCL 213.23 (emphasis added).

[21] *Id.*

14

first sentence of MCL 213.23 states that a public corporation such as Wayne County "is authorized" to condemn private property if the other preconditions of § 23 are met. To "authorize" is to "to give the authority or official power to" or "to empower."[22] By its plain language, this first sentence is an affirmative grant of eminent domain power to public corporations and state agencies.

Contrary to defendants' arguments, giving effect to the plain language of the first sentence does not render the remainder of § 23 nugatory. The second sentence applies only to condemnation by the state, its agencies or their divisions; thus, it applies to a subset of the groups covered by the first sentence. Further, it establishes a precondition to the condemnation for a public purpose designated by the Legislature—namely, the appropriation of funds to the state agency or division for that purpose. Finally, the second sentence, unlike the first, authorizes specific methods of exercising the power of eminent domain. Accordingly, the second sentence of MCL 213.23 does not alter the plain meaning of the first: Wayne County, as a public corporation, is authorized by MCL 213.23 to condemn

---

[22] *Random House Webster's Unabridged Dictionary* (2nd ed, 2001).

15

property, albeit subject to other constitutional and statutory limitations.

The second question raised by the county's reliance on the "for public purposes within the scope of its powers" phrase in § 23 is whether these *particular* condemnations are "within the scope of [Wayne County's] powers." The power upon which plaintiff relies—the authority to condemn "for public purposes *within the scope of its powers*"—calls for an analysis of the scope of Wayne County's "powers," and an assessment of whether the proposed condemnations are within those powers.

Art 7, § 1 of our 1963 Constitution provides that "[e]ach organized county shall be a body corporate with powers and immunities provided by law." The Constitution also declares that a county may codify in its charter the power "to adopt resolutions and ordinances relating to its concerns."[23] These constitutional provisions are to be "liberally construed":

> The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor. Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution.[24]

---

[23] Const 1963, art 7, § 2.

[24] Const 1963, art 7, § 34.

16

Given the broad authority conferred by the Constitution upon local governments, this Court has acknowledged that Michigan "is a home rule state," in which "local governments are vested with general constitutional authority to act on all matters of local concern not forbidden by state law."[25] The Legislature has also recognized that the Michigan constitution establishes a system of home rule. The charter county act,[26] enacted in 1966, states that county charters may expressly provide for

> [t]he authority to perform at the county level any function or service not prohibited by law, which shall include, by way of enumeration and not limitation: Police protection, fire protection, planning, zoning, education, health, welfare, recreation, water, sewer, waste disposal, transportation, abatement of air and water pollution, civil defense, *and any other function or service necessary or beneficial to the public health, safety, and general welfare of the county.*[27]

Plaintiff Wayne County has claimed all the authority granted by these constitutional and statutory provisions. Its charter states:

> Wayne County, a body corporate, possesses home rule power enabling it to provide for any matter of County concern and all powers conferred by the constitution or law upon charter counties

---

[25] *Airlines Parking v Wayne Co,* 452 Mich 527, 537 n 18; 550 NW2d 490 (1996).

[26] MCL 45.501 *et seq.*

[27] MCL 45.515(c) (emphasis added).

17

or upon general law counties, their officers, or agencies.[28]

With this charter provision, Wayne County has claimed for itself the power to act in all matters not specifically reserved by statute or constitution to the state. The county's "powers" include the authority to pursue any end that is "necessary or beneficial to the public health, safety, and general welfare" of the county,[29] assuming that the pursuit of that objective is not reserved by our Constitution or by statute to the state.

In this case, Wayne County has condemned the defendants' real properties for the following purposes: "(1) the creation of jobs for its citizens, (2) the stimulation of private investment and redevelopment in the county to insure a healthy and growing tax base so that the county can fund and deliver critical public services, (3) stemming the tide of disinvestment and population loss, and (4) supporting development opportunities which would otherwise remain unrealized."[30] The analysis provided in this opinion demonstrates that, unless the pursuit of one or more of these objectives has been assigned to the state by law, any condemnation in furtherance of these goals is

---

[28] Wayne County Charter, § 1.112.

[29] See MCL 45.515(c) (emphasis added).

[30] Quoted from complaint for condemnation.

"within the scope of Wayne County's powers," as required by MCL 213.23. Defendants have adduced no constitutional or statutory support for the proposition that a home rule county such as Wayne County may not pursue these objectives. Accordingly, the proposed condemnations are—at least for statutory purposes—within the scope of Wayne County's powers.

The pursuit of the goals cited above is within the scope of Wayne County's powers, and each goal certainly advances a "public purpose." A "public purpose" has been defined as that which "'has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose.'"[31] A transition from a declining rustbelt economy to a growing, technology-driven economy would, no doubt, promote prosperity and general welfare. Consequently, the county's goal of drawing commerce to metropolitan Detroit and its environs by converting the subject properties to a state-of-the-art technology and

---

[31] *Gaylord v Gaylord City Clerk,* 378 Mich 273, 300; 144 NW2d 460 (1966), quoting *Hays v Kalamazoo,* 316 Mich 443, 454; 25 NW2d 787 (1947), quoting 37 Am Jur, Municipal Corporations, § 120, p 734.

business park is within this definition of a "public purpose."

That is not to say, of course, that the exercise of eminent domain in this case passes constitutional muster. While the proposed condemnations satisfy the broad parameters established by MCL 213.23, it must also be determined whether these condemnations pass the more narrow requirements of our Constitution. We address this question later.

### 2. "NECESSARY"

For a public corporation to condemn property under MCL 213.23, a proposed taking must not only advance one of the three objectives listed in that statute, but it must also be "necessary" to that end. The Legislature has vested the authority to determine the necessity required under MCL 213.23 in those entities authorized to condemn private property under that statute.[32] Accordingly, Michigan's courts are bound by a public corporation's determination that a proposed condemnation serves a public necessity

---

[32] MCL 213.56(2) ("With respect to an acquisition by a public agency, the determination of public necessity by that agency is binding on the court in the absence of a showing of fraud, error of law, or abuse of discretion.").

20

unless the party opposing the condemnation demonstrates "fraud, error of law, or abuse of discretion."[33]

Defendants advance three basic arguments for the proposition that plaintiff has failed to establish that the takings are "necessary" as required by MCL 213.23 and therefore abused its discretion in condemning the subject properties. They contend, first, that the county has neither identified specific private purchasers for each of the defendants' parcels nor demonstrated that the parcels will be put to productive use now or in the immediate future. Thus, defendants argue that Wayne County is impermissibly using the power of eminent domain to "stockpile" land for speculative future use, a practice expressly prohibited fifty years ago in *Grand Rapids Bd of Ed v Baczewski*.[34]

We disagree. The proposed condemnations are quite unlike the exercise of eminent domain prohibited in *Baczewski*. There, a local board of education attempted to condemn property near a high school because it surmised that the high school would need to expand in approximately

---

[33] *Id.* See also *Detroit v Lucas,* 180 Mich App 47, 53; 446 NW2d 596 (1989).

[34] *Grand Rapids Bd of Ed v Baczewski*, 340 Mich 265, 272; 65 NW2d 810 (1954).

21

thirty years. The affected landowner challenged the condemnation under the 1908 Constitution,[35] which—in contrast to the 1963 Constitution[36]—expressly required any exercise of eminent domain to be "necessary." This Court held that a condemnation is "necessary" only if the condemned property will be used "immediately" or "within a period of time that the jury determines to be the 'near future' or a 'reasonably immediate use.'"[37] The speculative need for property in thirty years time lacked any of the urgency of a "necessary" condemnation.

Even if we grant, arguendo, that the definition of "necessity" under the 1908 Constitution applies to MCL 213.23 as well, the present case is nevertheless distinguishable from *Baczewski*. Whereas the school board in *Baczewski* admitted that it would not need the defendant's property for thirty years after its condemnation, plaintiff has a definite plan for defendants' properties and intends to construct a business and

---

[35] Const 1908, art 13, § 1 ("Private property shall not be taken by the public nor by any corporation for public use, without the necessity therefor being first determined and just compensation therefor being first made or secured in such manner as shall be prescribed by law.").

[36] Const 1963, art 10, § 2 ("Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law. Compensation shall be determined in proceedings in a court of record.").

[37] *Baczewski, supra* at 272.

technology park as soon as possible. According to the trial court's summary of testimony at trial, the acquisition of defendants' properties would also enable the county to achieve a "critical mass of property," and would thereby facilitate investment in the project. *Baczewski* does not bar an exercise of the power of eminent domain simply because the ultimate owner of the condemned land has yet to be identified.

Second, defendants argue that the proposed condemnations are not "necessary" under MCL 213.23 because plaintiff must still clear a number of procedural hurdles in order to proceed with the Pinnacle Project. These include the need for a special exclusion from the FAA in order to use land acquired through the noise abatement program for the Pinnacle Project, environmental concerns that may arise if construction of the project disturbs extant wildlife habitats, and the creation of local district finance authority and tax increment finance plan under the Local Development Financing Act.[38]

This argument is unpersuasive. MCL 213.23 requires a proposed condemnation to be "necessary" to advance one of the specified purposes. It does not, however, require that the condemning authority clear all other statutory and

_____

[38] MCL 125.2151 *et seq.*

23

procedural hurdles before commencing condemnation proceedings. In arguing that the plaintiff has failed to demonstrate necessity, defendants have essentially read new requirements into MCL 213.23.

Finally, defendants assert, without supporting argument, that plaintiff has failed to establish that "the [business and technology] park is necessary for the public." Given defendants' failure to brief the issue, this Court may consider it abandoned.[39] In any event, the argument erroneously shifts the burden of proof to plaintiff when the party opposing condemnation bears the burden of proving fraud, error of law, or abuse of discretion by the condemning authority.[40]

### 3. "FOR THE USE OR BENEFIT OF THE PUBLIC"

A condemnation that is necessary for a public purpose within the scope of the condemning authority's powers must also be "for the use or benefit of the public" in order to be valid under MCL 213.23. There is ample evidence in the record that the Pinnacle Project would benefit the public. The development is projected to bring jobs to the struggling local economy, add to tax revenues and thereby increase the resources available for public services, and

---

[39] *Gross v Gen Motors Corp,* 448 Mich 147, 162 n 8; 528 NW2d 707 (1995).

[40] See n 14, *supra,* and accompanying text.

24

attract investors and businesses to the area, thereby reinvigorating the local economy.

In fact, defendants do not dispute that the proposed condemnations would benefit the public. Instead, relying on *City of Lansing v Edward Rose Realty, Inc,*[41] defendants argue that the benefits that private parties will receive through the Pinnacle Project outweigh any benefits that the general public is likely to receive and, therefore, that plaintiff has failed to establish a "public use or benefit."

The two *Edward Rose* passages on which defendants rely, however, concern issues quite distinct from those under consideration here. The *Edward Rose* Court first engaged in a balancing of public and private interests in addressing whether a city ordinance authorizing the condemnation of private property was a legitimate exercise of the general authority conferred upon Lansing as a home rule city.[42] The Court then returned to the balancing of public and private interests when evaluating the city's ordinance under the "heightened scrutiny" test of *Poletown.*[43] Neither passage concerns the meaning of the phrase "public benefit," much

---

[41] *City of Lansing v Edward Rose Realty, Inc,* 442 Mich 626; 502 NW2d 638 (1993).

[42] *Id.* at 634-635

[43] *Poletown, supra* at 634-635.

25

less the meaning of "public benefit" as used in MCL 213.23. Moreover, *Edward Rose* nowhere suggests that the "public use or benefit" element of MCL 213.23 requires a balancing of public and private benefits, or that public benefits must predominate over private ones under this statute. As such, defendants have failed to persuade us that the proposed condemnations will fail to provide a "public benefit" within the meaning of MCL 213.23.

On the basis of the foregoing analysis, we conclude that the condemnations sought by Wayne County are consistent with MCL 213.23 and that this statute is a separate and independent grant of eminent domain authority to public corporations such as Wayne County. If the authority to condemn private property conferred by the Legislature lacked any constitutional limits, this Court would be compelled to affirm the decisions of the circuit court and the Court of Appeals. But our state Constitution does, in fact, limit the state's power of eminent domain. Therefore, it must be determined whether the proposed condemnations pass constitutional muster.

### B. ART 10, § 2

Art 10, § 2 of Michigan's 1963 Constitution provides that "[p]rivate property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law." Plaintiffs contend

26

that the proposed condemnations are not "for public use," and therefore are not within constitutional bounds. Accordingly, our analysis must now focus on the "public use" requirement of Art 10, § 2.

### 1. "Public Use" as a Legal Term of Art

The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.[44] This rule of "common understanding" has been described by Justice COOLEY in this way:

> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great* mass *of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.'"[45]

In short, the primary objective of constitutional interpretation is to realize the intent of the people by whom and for whom the constitution was ratified.

---

[44] *Nutt, supra* at 573.

[45] *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971) (emphasis in original), quoting COOLEY's Constitutional Limitations 81.

This Court typically discerns the common understanding of constitutional text by applying each term's plain meaning at the time of ratification.[46] But if the constitution employs technical or legal terms of art, "we are to construe those words in their technical, legal sense."[47] Justice COOLEY has justified this principle of constitutional interpretation in this way:

> [I]t must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history, and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense. When the law speaks of an ex post facto law, it means a law technically known by that designation; the meaning of the phrase having become defined in the history of constitutional law, and being so familiar to the people that it is not necessary to employ language of a more popular character to designate it. The technical sense in these cases is the sense popularly understood, because that is the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights.[48]

---

[46] *Silver Creek, supra* at 375.

[47] *Id.*

[48] 1 Cooley, Constitutional Limitations (8th ed), p 130-133. See also in *In re Payne,* 444 Mich 679, 707 n 6; 512 NW2d 121 (1994) (RILEY, J., concurring in part and dissenting in part) (quoting a portion of this passage).

Justice COOLEY recognized, as demonstrated by the passage cited above, that, in ratifying a constitution, the people may understand that certain terms used in that document have a technical meaning within the law. Therefore, the people may ratify a constitution with the understanding that it incorporates legal terms of art—or, in Justice COOLEY's terms, words "employed in their technical sense." Cooley, *supra* at 132.

When one actually engages in the mode of analysis described by Justice COOLEY and quoted by Justice WEAVER, one need look no farther than the COOLEY treatise upon which the concurrence relies to see that "public use" is indeed a term of art. See Cooley, Constitutional Limitations (5th ed, 1998), p 657-666. After surveying some of the many judicial opinions wrestling with this concept, Justice COOLEY concludes: "But accepting as correct the decisions which have been made, it must be conceded that the term 'public use' as employed in the law of eminent domain, has a meaning much controlled by the necessity, *and somewhat different from that which it bears generally*." Cooley, Constitutional Limitations (5th ed, 1998), p 664-665 (emphasis added). See also *id.* at 659 ("We find ourselves somewhat at sea, however, when we undertake to define in the light of the judicial decisions, what constitutes a public use.").

Thus, the notion that the meaning of "public use" was "commonly understood by the people, learned and unlearned, who ratified the constitution," *post* at 22, is one that would have been quite foreign to Justice COOLEY. In fact, this eminent jurist admitted to being "somewhat at sea" in attempting to cull a single definition of "public use" from the complex case law on the power of eminent domain. Cooley, *supra* at 659. This admission from our patron saint of constitutional interpretation stands in stark contrast to fictionalized "common understanding" proffered by the concurring opinion.

Frankly, we are hard pressed to understand what differentiates Justice WEAVER's construction from our own. Justice WEAVER herself acknowledges that "public use" must be read as a technical term. See *post* at 20-21. Justice WEAVER's recognition that "public use" must be read in light of its "legal and constitutional history" is precisely our point.

Thus, in *Silver Creek,* for example, we determined that the phrase "just compensation" was a legal term of art of enormous complexity, and that its meaning could be discerned only by canvassing legal precedent on "just compensation" before 1963 to determine how an individual versed in the law before the Constitution's ratification would understand that concept.[49]  Indeed, we have held that the *whole* of art 10, § 2 has a technical meaning that must be discerned by examining the "purpose and history" of the power of eminent domain.[50]

"Public use" is a legal term of art every bit as complex as "just compensation."  It has reappeared as a positive limit on the state's power of eminent domain in Michigan's constitutions of 1850,[51] 1908,[52] and 1963,[53] and

_____

If there is any meaningful difference between reading a constitutional term according to its legal history because the ratifiers understood that the term was one with a technical meaning (our position) or because the ratifiers themselves were familiar with that legal history (Justice WEAVER's position) it is one we find difficult to discern. Under either Justice Weaver's locution or ours, "public use" is read according to its "legal and constitutional history."  Thus, it cannot be the case that our test leads more easily to "elitist" abuse than the hers, since Justice Weaver's "common understanding" approach is indistinguishable in result from our own.

[49] *Silver Creek, supra* at 376.

[50] *Peterman, supra* at 186-187.
[51] See Const 1850, art 15, § 9.  ("The property of no person shall be taken by any corporation for public use,

each invocation of "public use" has been followed by litigation over the precise contours of this language. Consequently, this Court has weighed in repeatedly on the meaning of this legal term of art. We can uncover the common understanding of art 10, § 2 only by delving into this body of case law, and thereby determining the "common understanding" among those sophisticated in the law at the time of the Constitution's ratification.

This case does not require that this Court cobble together a single, comprehensive definition of "public use" from our pre-1963 precedent and other relevant sources. The question presented here is a fairly discrete one: are the condemnation of defendants' properties and the subsequent transfer of those properties to private entities pursuant to the Pinnacle Project consistent with the common understanding of "public use" at ratification? For the reasons stated below, we answer that question in the negative.

## 2. "Public Use" and Private Ownership

When our Constitution was ratified in 1963, it was well-established in this Court's eminent domain

without compensation being first made or secured, in such manner as may be prescribed by law.").

[52] See note 35.

[53] See note 36.

31

jurisprudence that the constitutional "public use" requirement was not an absolute bar against the transfer of condemned property to private entities.[54] It was equally clear, however, that the constitutional "public use" requirement worked to prohibit the state from transferring condemned property to private entities for a *private* use.[55] Thus, this Court's eminent domain jurisprudence—at least that portion concerning the reasons for which the state may condemn private property—has focused largely on the area between these poles.

Justice RYAN's *Poletown* dissent accurately describes the factors that distinguish takings in the former category from those in the latter according to our pre-1963 eminent domain jurisprudence.[56] Accordingly, we conclude that the transfer of condemned property is a "public use" when it possess one of the three characteristics in our pre-1963 case law identified by Justice RYAN.

---

[54] This fact is also noted by Justice RYAN in his *Poletown* dissent. *Poletown, supra* at 670.

[55] See, e.g., *Bd of Health of Portage Twp v Van Hoesen,* 87 Mich 533; 49 NW 894 (1891) (dismissing a petition seeking the condemnation of private property for use as a cemetery).

[56] *Poletown, supra* at 674-681. Although Justice RYAN viewed these common elements as "exceptions" to the general rule against condemnations for private use, the three exceptions reflect concepts that are incorporated into the definition of "public use," given the principles of constitutional interpretation articulated above.

First, condemnations in which private land was constitutionally transferred by the condemning authority to a private entity involved "public necessity of the extreme sort otherwise impracticable."[57] The "necessity" that Justice RYAN identified in our pre-1963 case law is a specific kind of need:

> [T]he exercise of eminent domain for private corporations has been limited to those enterprises generating public benefits whose very *existence* depends on the use of land that can be assembled only by the coordination central government alone is capable of achieving.[58]

Justice Ryan listed "highways, railroads, canals, and other instrumentalities of commerce" as examples of this brand of necessity.[59] A corporation constructing a railroad, for example, must lay track so that it forms a more or less straight path from point A to point B. If a property owner between points A and B holds out—say, for example, by refusing to sell his land for any amount less than fifty times its appraised value—the construction of the railroad is halted unless and until the railroad accedes to the property owner's demands. And if owners of adjoining properties receive word of the original property owner's windfall, they too will refuse to sell.

---

[57] *Id.* at 675 (RYAN, J., dissenting).

[58] *Id.* at 676 (emphasis in original).

[59] *Id.* at 675.

The likelihood that property owners will engage in this tactic makes the acquisition of property for railroads, gas lines, highways, and other such "instrumentalities of commerce" a logistical and practical nightmare. Accordingly, this Court has held that the exercise of eminent domain in such cases—in which collective action is needed to acquire land for vital instrumentalities of commerce—is consistent with the constitutional "public use" requirement.[60]

Second, this Court has found that the transfer of condemned property to a private entity is consistent with the constitution's "public use" requirement when the private entity remains accountable to the public in its use of that property.[61] Indeed, we disapproved of the use of eminent domain in *Portage Twp Bd of Health* in part because

---

[60] See, e.g., *Swan v Williams,* 2 Mich 427 (1852) (holding that the condemnation of private property by a railroad company was consistent with the eminent domain provision of the federal constitution and the Northwest Ordinance of 1787).

[61] *Poletown, supra* at 677 (RYAN, J., dissenting), citing *Swan, supra* at 439-440 ("'By the terms of the charter the title to the lands is contingent upon their occupation as a railroad. It is vested in the company so long as they are used for a railroad, and no longer.'").

the entity acquiring the condemned land would not be subject to public oversight.[62]  As Justice RYAN observed:

> [T]his Court disapproved condemnation that would have facilitated the generation of water power by a private corporation because the power company "will own, lease, use, and control" the water power.  In addition, [we] warned, "Land cannot be taken, under the exercise of the power of eminent domain, unless, after it is taken, it will be devoted to the *use* of the public, *independent of the will of the corporation taking it.*"[63]

In contrast, we concluded in *Lakehead Pipe Line Co v Dehn* that the state retained sufficient control of a petroleum pipeline constructed by plaintiff on condemned property.[64] We noted specifically that plaintiff had "pledged itself to transport in intrastate commerce,"[65] that plaintiff's pipeline was used pursuant to directions from the Michigan Public Service Commission, and that the state would be able to enforce those obligations, should the need arise.[66]

Thus, in the common understanding of those sophisticated in the law at the time of ratification, the

---

[62] *Poletown, supra.* at 677 (RYAN, J., dissenting), quoting *Portage Twp Bd of Health, supra* at 539.

[63] *Poletown, supra* at 678 (RYAN, J., dissenting) (emphasis in original; citations omitted), citing *Berrien Springs Water-Power Co v Berrien Circuit Judge,* 133 Mich 48, 51, 53; 94 NW 379 (1903).

[64] *Lakehead PipeLine Co v Dehn,* 340 Mich 25; 64 NW2d 903 (1954).

[65] *Id.* at 42.

[66] *Id.* at 41-42.

"public use" requirement would have allowed for the transfer of condemned property to a private entity when the public retained a measure of control over the property.

Finally, condemned land may be transferred to a private entity when the selection of the land to be condemned is itself based on public concern.[67] In Justice RYAN's words, the property must be selected on the basis of "facts of independent public significance," meaning that the underlying purposes for resorting to condemnation, rather than the subsequent use of condemned land, must satisfy the Constitution's public use requirement.

The primary example of a condemnation in this vein is found in *In re Slum Clearance,*[68] a 1951 decision from this Court. In that case, we considered the constitutionality of Detroit's condemnation of blighted housing and its subsequent resale of those properties to private persons. The city's *controlling purpose* in condemning the properties was to remove unfit housing and thereby advance public health and safety; subsequent resale of the land cleared of blight was "incidental" to this goal.[69] We concluded,

---

[67] *Poletown, supra* at 680 (RYAN, J., dissenting).

[68] *In re Slum Clearance*, 331 Mich 714; 50 NW2d 340 (1951), is cited in *Poletown, supra* at 680 (RYAN, J., dissenting).

[69] *Id.* at 721.

therefore, that the condemnation was indeed a "public use," despite the fact that the condemned properties would inevitably be put to private use. *In re Slum Clearance* turned on the fact that the act of condemnation *itself*, rather than the use to which the condemned land eventually would be put, was a public use.[70]  Thus, as Justice RYAN observed, the condemnation was a "public use" because the land was selected on the basis of "facts of independent public significance"[71]—namely, the need to remedy urban blight for the sake of public health and safety.

The foregoing indicates that the transfer of condemned property to a private entity, seen through the eyes of an individual sophisticated in the law at the time of ratification of our 1963 Constitution, would be appropriate in one of three contexts: (1) where "public necessity of the extreme sort" requires collective action; (2) where the property remains subject to public oversight after transfer to a private entity; and (3) where the property is selected because of "facts of independent public significance," rather than the interests of the private entity to which the property is eventually transferred.[72]

---

[70] *In re Slum Clearance, supra* at 720.

[71] *Poletown, supra* at 680 (RYAN, J., dissenting).

[72] *Id.* at 674-681 (RYAN, J., dissenting).

## 3. *POLETOWN,* THE PINNACLE PROJECT, AND PUBLIC USE

The exercise of eminent domain at issue here—the condemnation of defendants' properties for the Pinnacle Project and the subsequent transfer of those properties to private entities—implicates none of the saving elements noted by our pre-1963 eminent domain jurisprudence.

The Pinnacle Project's business and technology park is certainly not an enterprise "whose very *existence* depends on the use of land that can be assembled only by the coordination central government alone is capable of achieving."[73] To the contrary, the landscape of our country is flecked with shopping centers, office parks, clusters of hotels, and centers of entertainment and commerce. We do not believe, and plaintiff does not contend, that these constellations required the exercise of eminent domain or any other form of collective public action for their formation.

Second, the Pinnacle Project is not subject to public oversight to ensure that the property continues to be used for the commonweal after being sold to private entities. Rather, plaintiff intends for the private entities purchasing defendants' properties to pursue their own financial welfare with the single-mindedness expected of

---

[73] *Id.* at 676 (RYAN, J., dissenting).

any profit-making enterprise. The public benefit arising from the Pinnacle Project is an epiphenomenon of the eventual property owners' collective attempts at profit maximization. No formal mechanisms exist to ensure that the businesses that would occupy what are now defendants' properties will continue to contribute to the health of the local economy.

Finally, there is nothing about the *act* of condemning defendants' properties that serves the public good in this case. The only public benefits cited by plaintiff arise after the lands are acquired by the government and put to private use. Thus, the present case is quite unlike *Slum Clearance* because there are no facts of independent public significance (such as the need to promote health and safety) that might justify the condemnation of defendants' lands.

We can only conclude, therefore, that no one sophisticated in the law at the 1963 Constitution's ratification would have understood "public use" to permit the condemnation of defendants' properties for the construction of a business and technology park owned by private entities. Therefore, the condemnations proposed in this case are unconstitutional under art 10, § 2.

Indeed, the only support for plaintiff's position in our eminent domain jurisprudence is the majority opinion in

39

*Poletown*. In that opinion per curiam, a majority of this Court concluded that our Constitution permitted the Detroit Economic Development Corporation to condemn private residential properties in order to convey those properties to a private corporation for the construction of an assembly plant.[74]

As an initial matter, the opinion contains an odd but telling internal inconsistency. The majority first acknowledges that the property owners in that case "urge[d the Court] to distinguish between the terms 'use' and 'purpose', asserting they are not synonymous and have been distinguished in the law of eminent domain."[75] This argument, of course, was central to plaintiffs' case, because the Constitution allows the exercise of eminent domain only for a "public *use*."[76] The Court then asserted that the plaintiffs *conceded* that the Constitution allowed condemnation for a "public use" *or* a "public purpose," despite the fact that such a concession would have dramatically undermined plaintiffs' argument:

> There is no dispute about the law. All agree that condemnation for a public use or purpose is permitted. … The heart of this dispute is whether the proposed condemnation is for the

---

[74] *Id.* at 628-629.

[75] *Id.* at 629-630.

[76] Const 1963, art 10, § 2 (emphasis added).

40

primary benefit of the public or the private user.[77]

The majority therefore contended that plaintiffs waived a distinction they had "urged" upon the Court. And in so doing, the majority was able to avoid the difficult question whether the condemnation of private property for another private entity was a "public use" as that phrase is used in our Constitution.[78]

This inconsistency aside, the majority opinion in *Poletown* is most notable for its radical and unabashed departure from the entirety of this Court's pre-1963 eminent domain jurisprudence. The opinion departs from the "common understanding" of "public use" at the time of ratification in two fundamental ways.

First, the majority concluded that its power to review the proposed condemnations is limited because

> "[t]he determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances

---

[77] *Poletown, supra* at 632.

[78] Moreover, as Justice RYAN noted, the majority also conflated the broad construction of "public purpose" in our taxation jurisprudence with the more limited construction of "public purpose" in the eminent domain context. See *id.* at 665-667.

41

where such determination is palpable and manifestly arbitrary and incorrect."[79]

The majority derived this principle from a *plurality* opinion of this Court[80] and supported the application of the principle with a citation of an opinion of the United States Supreme Court concerning judicial review of congressional acts under the Fifth Amendment of the federal constitution.[81] Neither case, of course, is binding on this Court in construing the takings clause of our state Constitution, and neither is persuasive authority for the use to which they were put by the *Poletown* majority.

It is not surprising, however, that the majority would turn to nonbinding precedent for the proposition that the Court's hands were effectively tied by the Legislature. As Justice RYAN's dissent noted:

> In point of fact, this Court has *never* employed the minimal standard of review in an eminent domain case which is adopted by the [*Poletown*] majority . . . . Notwithstanding explicit legislative findings, this Court has always made an *independent* determination of what constitutes a public use for which the power of eminent domain may be utilized.[82]

---

[79] *Id.* at 632, quoting *Gregory Marina, Inc v Detroit*, 378 Mich 364, 396; 144 NW2d 503 (1966) (plurality opinion).

[80] *Gregory Marina, supra.*

[81] *Berman v Parker,* 348 US 26; 75 S Ct 98; 99 L Ed 27 (1954). Justice RYAN noted in his *Poletown* dissent that the majority's reliance on this case "[was] particularly disingenuous." *Poletown, supra* at 668.

[82] *Id.* at 669 (emphasis in original).

Our eminent domain jurisprudence since Michigan's entry into the union amply supports Justice Ryan's assertion.[83] Questions of public *purpose* aside, whether the proposed condemnations were consistent with the Constitution's "public use" requirement was a constitutional question squarely within the Court's authority.[84] The Court's reliance on *Gregory Marina* and *Berman* for the contrary position was, as Justice Ryan observed, "disingenuous."[85]

Second, the *Poletown* majority concluded, for the first time in the history of our eminent domain jurisprudence, that a generalized economic benefit was sufficient under art 10, § 2 to justify the transfer of condemned property to a private entity. Before *Poletown,* we had never held that a private entity's pursuit of profit was a "public use" for constitutional takings purposes simply because one entity's profit maximization contributed to the health of the general economy.

---

[83] See, e.g., *Shizas v City of Detroit*, 333 Mich 44; 52 NW2d 589 (1952) (holding that the proposed condemnation was unconstitutional); similarly *Portage Twp Bd of Health, supra; Ryerson v Brown,* 35 Mich 333 (1877); *Trombley, supra.*

[84] See, e.g., *Lakehead Pipe Line Co. v Dehn,* 340 Mich. 25, 39; 64 NW2d 903 (1954) ("'The question of whether the proposed use is a public use is a judicial one.'"), quoting *Cleveland v Detroit,* 332 Mich 172, 179; 33 NW2d 747 (1948).

[85] *Poletown, supra* at 668 (Ryan, J., dissenting).

Justice COOLEY considered a similar proposition[86] well over a century ago and held that incidental benefits to the economy did not justify the exercise of eminent domain for private, water-powered mills:

> The statute [allowing the condemnation of private property for the construction of private powermills] appears to have been drawn with studious care to avoid any requirement that the person availing himself of its provisions shall consult any interest except his own, and it therefore seems perfectly manifest that when a public use is spoken of in this statute nothing further is intended than that the use shall be one that, in the opinion of the commission or jury, will in some manner advance the public interest. But incidentally every lawful business does this.[87]

Justice COOLEY was careful to point out that the Court was not ruling out the possibility that "incidental benefits to the public" might, in some cases, "justify an exercise of the right of eminent domain."[88] But Wayne County has not directed us to a single case, other than *Poletown,* holding that a vague economic benefit stemming from a private profit-maximizing enterprise is a "public use."

---

[86] *Ryerson, supra* at 337 ("An examination of the adjudged cases will show that the courts, in looking about for the public use that was to be accommodated by the statute, have sometimes attached considerable importance to the fact that the general improvement of mill sites, as property possessing great value if improved, and often nearly worthless if not improved, would largely conduce to the prosperity of the state.").

[87] *Id.* at 339.

[88] *Id.*

Every business, every productive unit in society, does, as Justice COOLEY noted, contribute in some way to the commonweal.[89]  To justify the exercise of eminent domain solely on the basis of the fact that the use of that property by a private entity seeking its own profit might contribute to the economy's health is to render impotent our constitutional limitations on the government's power of eminent domain.  *Poletown*'s "economic benefit" rationale would validate practically *any* exercise of the power of eminent domain on behalf of a private entity.  After all, if one's ownership of private property is forever subject to the government's determination that another private party would put one's land to better use, then the ownership of real property is perpetually threatened by the expansion plans of any large discount retailer, "megastore," or the like.  Indeed, it is for precisely this reason that this Court has approved the transfer of condemned property to private entities only when certain other conditions—those identified in our pre-1963 eminent domain jurisprudence in Justice RYAN's *Poletown* dissent—are present.[90]

---

[89] *Id.*

[90] See Part B(2).

Because *Poletown*'s conception of a public use—that of "alleviating unemployment and revitalizing the economic base of the community"[91]—has no support in the Court's eminent domain jurisprudence before the Constitution's ratification, its interpretation of "public use" in art 10, § 2 cannot reflect the common understanding of that phrase among those sophisticated in the law at ratification. Consequently, the *Poletown* analysis provides no legitimate support for the condemnations proposed in this case and, for the reasons stated above, is overruled.

We conclude that the condemnations proposed in this case do not pass constitutional muster because they do not advance a public use as required by Const 1963, art 10, § 2. Accordingly, this case is remanded to the Wayne Circuit Court for entry of summary disposition in defendants' favor.

### C. RETROACTIVITY

In the process of determining that the proposed condemnations cannot pass constitutional muster, we have concluded that this Court's *Poletown* opinion is inconsistent with our eminent domain jurisprudence and advances an invalid reading of our constitution. Because that decision was in error and effectively rendered

---

[91] *Poletown, supra* at 634.

46

nugatory the constitutional public use requirement, it must be overruled.[92]

It is true, of course, that this Court must not "lightly overrule precedent."[93] But because *Poletown* itself was such a radical departure from fundamental constitutional principles and over a century of this Court's eminent domain jurisprudence leading up to the 1963 Constitution, we must overrule *Poletown* in order to vindicate our Constitution, protect the people's property rights, and preserve the legitimacy of the judicial branch as the expositor—not creator—of fundamental law.[94]

In the twenty-three years since our decision in *Poletown,* it is a certainty that state and local government actors have acted in reliance on its broad, but erroneous, interpretation of art 10, § 2. Indeed, Wayne County's course of conduct in the present case was no doubt shaped by *Poletown*'s disregard for constitutional limits on the exercise of the power of eminent domain and the license that opinion appeared to grant to state and local authorities.

---

[92] *Pohutski v City of Allen Park,* 465 Mich 675, 695; 641 NW2d 219 (2002).

[93] *Id.* at 693.

[94] *Id.* at 695.

Nevertheless, there is no reason to depart from the usual practice of applying our conclusions of law to the case at hand.[95]  Our decision today does not announce a new rule of law, but rather returns our law to that which existed before *Poletown* and which has been mandated by our constitution since it took effect in 1963.[96]  Our decision simply applies fundamental constitutional principles and enforces the "public use" requirement as that phrase was used at the time our 1963 Constitution was ratified.[97]

Therefore, our decision to overrule *Poletown* should have retroactive effect, applying to all pending cases in which a challenge to *Poletown* has been raised and preserved.[98]

---

[95] See, e.g., *Lesner v Liquid Disposal*, 466 Mich 95, 108; 643 NW2d 553 (2002).

[96] *Pohutski, supra* at 696.

[97] See Baughman, *Justice Moody's lament unanswered: Michigan's unprincipled retroactivity jurisprudence,* 79 Mich B J 664 (2000), quoting Cooley, Constitutional Limitations, 91 ("When the Michigan Supreme Court exercises the 'judicial power,' it is, as said by Justice Cooley, concerned with a determination of what the existing law is, even in 'changing' a mistaken interpretation, rather than making a 'predetermination of what the law shall be for the regulation of all future cases,' which is an act that 'distinguishes a legislative act from a judicial one.'").

[98] We disagree with Justice Cavanagh's conclusion that this decision should apply prospectively.  First, this case presents none of the exigent circumstances that warranted the "extreme measure" of prospective application in *Pohutski v City of Allen Park.  Gladych v New Family Homes, Inc,* 468 Mich 594, 606 n 6; 664 NW2d 705 (2003.  Second,

48

CONCLUSION

We conclude that the condemnation of defendants' properties is consistent with MCL 213.23. However, we also hold that the proposed condemnations do not advance a "public use" as required by art 10, § 2 of our 1963 Constitution. Therefore, the decisions of the lower courts are reversed and this matter is remanded for entry of an order of summary disposition in defendants' favor.

Robert P. Young, Jr.
Maura D. Corrigan
Clifford W. Taylor
Stephen J. Markman

there is a serious question as to whether it is constitutionally legitimate for this Court to render purely prospective opinions, as such rulings are, in essence, advisory opinions. The only instance in which we are constitutionally authorized to issue an advisory opinion is upon the request of either house of the legislature or the governor—and, then, only "on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date." Const 1963 art 3, § 8. Furthermore, this Court has recognized that "[c]omplete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law." *Hyde v Univ of Mich Bd of Regents,* 426 Mich 223, 240; 393 NW2d 847 (1986). Because *Poletown* was a radical departure from our eminent domain jurisprudence, it is hardly the "clear and uncontradicted case law" contemplated by *Hyde.*

49

# STATE OF MICHIGAN

## SUPREME COURT

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                 No. 124070

EDWARD HATHCOCK,

    Defendant-Appellant.

_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                 No. 124071

ARRON T. SPECK and DONALD E. SPECK,

    Defendants-Appellants.

_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                 No. 124072

AUBINS SERVICE, INC. and DAVID R.
YORK, Trustee of the DAVID R. YORK
REVOCABLE LIVING TRUST,

    Defendants-Appellants.

_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                 No. 124073

JEFFREY J. KOMISAR,

Defendant-Appellant.
_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                         No. 124074

ROBERT WARD and LELA WARD,

    Defendants-Appellants,
and

HENRY Y. COOLEY,

    Defendant.
_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                         No. 124075

MRS. JAMES GRIZZLE and MICHELLE
A. BALDWIN,

    Defendants-Appellants,
and

RAMI FAKHOURY,

    Defendant.
_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                         No. 124076

STEPHANIE A. KOMISAR,

    Defendant-Appellant.
_____/

2

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                   No. 124077

THOMAS L. GOFF, NORMA GOFF, MARK
A. BARKER, JR., and KATHLEEN A. BARKER,

    Defendants-Appellants.
_____/

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                   No. 124078

VINCENT FINAZZO,

    Defendant-Appellant,
and

AUBREY L. GREGORY and DULCINA
GREGORY,

    Defendants.

_____

WEAVER, J. (concurring in part and dissenting in part)

I concur with the majority's result and decision to overrule *Poletown Neighborhood Council v Detroit,* 410 Mich 616; 304 NW2d 455 (1981), but do so for my own reasons.[1]

The Michigan Constitution states:

> Private property shall not be taken for public use without just compensation therefor being

---

[1] I also concur in the majority's reasoning for applying this decision retroactively.

3

first made and secured in a manner prescribed by law . . . . [Const 1963, art 10, § 2.]

Proper application of the art 10, § 2's "public use" limitation on the exercise of eminent domain requires that the Court abandon *Poletown's* holding that land can be taken by the government and transferred to a private entity upon the mere showing that the economy will generally benefit from the condemnation. Thus, Wayne County's attempt to use its eminent domain authority to transfer defendants' properties to private developers to be included in a business and technology park violates the "public use" limitation of art 10, § 2 even though the park might benefit the region's economy.[2]

I dissent from the majority's holding that "public use" must be interpreted as it would have been by those "sophisticated" or "versed in the law" at the time of the 1963 Constitution's ratification and from their application of that holding to the facts of this case. Unlike the majority, I would employ the long-established method of constitutional interpretation that restrains judges by

---

[2] The public purposes achievable by public corporations through condemnation pursuant to MCL 213.23 must conform to the "public use" limitation of Const 1963 art 10, §2. Because the county's public purposes extend well beyond the constitution's "public use" limitation, the county may not condemn the properties at issue.

4

requiring them to ascertain the common understanding of the people who adopted the constitution. The majority's focus on the understanding of those "sophisticated in the law" is elitist; it perverts the primary rule of constitutional interpretation — that constitutions must be interpreted as the people, learned and unlearned, would commonly understand them. It invites the erosion of constitutional protections intended by the Michigan voters who ratified the 1963 Constitution.[3] The majority's approach ignores the words of Michigan's respected jurist, Justice THOMAS M. COOLEY, who warned against the tendency to force from the Constitution, by "interested subtlety and ingenious refinement," meaning that was never intended by the people who adopted it.[4]

---

[3] As explained in *Univ of Michigan Regents v Michigan*, 395 Mich 52, 74-75; 235 NW2d 1 (1975)(citations omitted) when the people ratified the 1963 Constitution, "the voters had before them the constitutional language and the explanatory 'Convention Comments' adopted by the delegates. Therefore, it is not the prerogative of this Court to change the plain meaning of the words in the constitution 'as understood by the people who adopted it.'"

[4] 1 Cooley, Constitutional Limitations, (8th ed), p 131.

## I. Constitutional Interpretation

Justice COOLEY'S often-cited description of the primary rule of constitutional interpretation bears repeating:

> "A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.'" [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley's Const Lim 81 (emphasis in *Traverse City School Dist*).]

To ascertain the common understanding of the Constitution, the Court may also consider the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished by it. *Traverse City School Dist, supra* at 405.

Contrary to Justice COOLEY'S warnings, the majority claims that the relevant "common understanding" by which we must interpret art 10, § 2 is that of those "sophisticated in the law at the time of the constitution's ratification." *Ante* at 32. Until the majority's decision in this case, this Court has never asserted that the term "public use" is

6

a term of such "enormous complexity" that the people who ratified the Constitution would be unable to grasp its meaning.[5]  This Court's first reliance on the perspective of those "sophisticated in the law" was in *Michigan Coalition of State Employee Unions v Civil Service Comm,* 465 Mich 212; 634 NW2d 692 (2001).  After appearing to acknowledge that constitutional language should be interpreted as it would have been understood by those who ratified it, the opinion asked, "Yet, what if the constitution had no plain meaning, but rather is a technical and legal term or phrase of art?"  *Id at* 222.  Citing, out of context, a statement by Justice COOLEY regarding commonly understood technical or legal terms that must be supposed to have been employed in their technical

---

[5] *Ante* at 31 (citing *Silver Creek Drain Dist v Extrusions Div Inc,* 468 Mich 367, 375; 663 NW2d 436 (2003). In *Silver Creek,* the same majority of justices incorrectly held that the term "just compensation" in Const 1963, art 10, § 2 must be interpreted as those "sophisticated in the law" would have understood the term at the time of the Constitution's ratification.  I dissented because, "'[j]ust compensation' has long been readily and reasonably understood to be that amount of money that puts the property owner whose property is taken in as good, but not better, a financial position after the taking as the property owner enjoyed before the taking." *Silver Creek, supra* at 384-385 (WEAVER, J. dissenting in part).

sense,[6] the Court majority then erroneously equated such terms to words that are "in no way part of the common vocabulary."[7] The Court majority next launched its unprecedented rule of constitutional interpretation:

> This, then, is the rule: if a constitutional phrase is a technical legal term or a phrase of art in the law, the phrase will be given the meaning that those sophisticated in the law understood at the time of the enactment unless it is clear from the constitutional language that some other meaning was intended. [*Id.* at 223.]

As in *Michigan Coalition,* the majority in this case claims to find support in Justice COOLEY'S treatise on constitutional interpretation, in which he wrote:

> [I]t must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense.[8]

---

[6] *Id.* (citing 1 Cooley, Constitutional Limitations (8th ed), p 132).

[7] *Id.* at 223, citing *Walker v Wolverine Fabricating & Mfg, Inc,* 425 Mich 586, 596; 391 NW2d 296 (1986).

[8] 1 Cooley, Constitutional Limitations (8th ed), p 132.

The majority takes this quote out of context and twists its meaning. When Justice Cooley's statement is returned to its full context, it neither supports nor justifies the majority's abandonment of the people's common understanding of constitutional terms for the understanding of those "sophisticated or learned in the law."

As is revealed in the full text, Justice Cooley sought to convey that certain constitutional terms have technical or legal meaning that is known to every person, learned or unlearned. Regarding such terms, Cooley suggested that it is unnecessary for the Court to give them a more popular or plainer meaning. Careful attention is warranted to Justice Cooley's language that in context reads:

> In interpreting clauses we must presume that *words have been employed in their natural and ordinary meaning*. As *Marshall*, Ch. J., says: The framers of the constitution, and the people who adopted it, "must be understood to have employed the words in their natural sense, and to have intended what they have said." This is but saying that no forced or unnatural construction is to be put upon their language; and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to re-declare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which

9

> every man, learned and unlearned, may be able to trace the leading principles of government.
>
> But it must not be forgotten, in construing our constitutions, that in many particulars they are but the legitimate successors of the great charters of English liberty, whose provisions declaratory of the rights of the subject have acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense. When the Constitution speaks of an *ex post facto* law, it means a law technically known by that designation; the meaning of the phrase having become defined in the history of constitutional law, and being so familiar to the people that it is not necessary to employ language of a more popular character to designate it. The technical sense in these cases is the sense popularly understood, because that is the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights.[9]

This passage does not suggest that courts should defer to the understanding of those "learned or sophisticated in the law." To the contrary, it simply affirms that certain legal and constitutional terms are so embedded in our constitutional law and history and their meanings so familiar to the people, that the court need not and must not attempt to redefine them. Clearly, Justice COOLEY does not suggest that the people's common understanding of such terms be replaced by a "sophisticated" understanding that

---

9 *Id.* at 130-133(emphasis added).

"may be forced, by "interested subtlety and ingenious refinement," from constitutional language.[10]  But this is the very danger that the majority's approach presents.

Justice COOLEY understood, as the majority refuses to accept, that the people do understand "the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights."[11] By substituting the "learned and sophisticated" understanding for that of the people's common understanding, the majority invites future judicial distortion of the Constitution, which was made by and for the people, and invites "interested subtlety and ingenious refinement" to "force from these instruments a meaning which their framers never held."[12]

---

[10] *Id.* at 131.

[11] *Id.* at 132-133.

[12] *Id.* at 131.  The majority has also incorrectly invoked its new rule of constitutional construction to interpret Const 1963, art 1, § 14, calling "The right of trial by jury" a "technical legal phrase with the meaning those understanding the jurisprudence of this state would give it." *Phillips v Mirac, Inc,* 470 Mich 415; __ NW2d__ (2004).  Previously, in 1952, this Court took a much more straightforward approach to the same phrase when trying to determine whether a particular statute provided for a right to a trial by jury. *Conservation Dep't v Brown*, 335 Mich 343, 346; 55 NW2d 859 (1952).  The Court stated, "The statute under which these . . . proceedings were brought is silent on the subject of a jury.  Michigan Constitution 1908, art 2, § 13, provides, as did Michigan's previous

Constitutional terms with commonly understood technical or legal meanings must, therefore, be distinguished from terms that have no meaning in the common vocabulary. For example, in *Walker v Wolverine Fabricating & Mfg Co, Inc,* 425 Mich 586, 596; 391 NW2d 296 (1986), the Court held that "[a]ppeals . . . tried de novo" was a term that had no meaning in the common vocabulary. The Court noted that scholars disagreed and constitutional convention delegates expressed confusion regarding the term's meaning.[13] *Walker* then explained the appropriate approach to the interpretation of such terms. In order to ascertain the common understanding, *Walker* stated:

> First, one can look to the Constitutional Convention's Address to the People for its explanation of an ambiguous term. Second, one can survey contemporaneous judicial decision and legal commentaries for evidence of a consensus within the legal community regarding the meaning of a term.[14]

---

Constitutions, that 'The right of trial by jury shall remain.' Thus the right to trial by jury is preserved in all cases where it existed prior to the adoption of the Constitution." *Conservation Dep't, supra* at 346. That the Court then considered the right as it existed in the common law before the ratification of the 1908 constitution does not transform the "right of trial by jury" into a concept too complex for nonlawyers and nonjudges, who are the vast majority of the citizens of this state.

[13] *Walker, supra* at 598-599.

[14] *Walker, supra* at 596-597.

The process of ascertaining the meaning of terms in a constitution that are not part of the common vocabulary through a survey of judicial decisions reflects the rule that the "framers of a Constitution are presumed to have knowledge of existing laws, . . . and act in reference to that knowledge."[15]  However, the process of ascertaining the understanding of the framers should not be confused with the process of ascertaining the understanding of the ratifiers.

Adhering to the common understanding of the ratifiers, as opposed to that of the "sophisticated in the law," helps ensure that courts restrain themselves from substituting a different meaning of a word to suit a court's own policy preferences.  As Justice COOLEY so wisely noted, "[n]arrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."[16]  It is perhaps for this

---

[15] *Id.* at 597 (citations omitted).  See also, *Michigan United Conservation Clubs v Secretary of State* (After Remand), 464 Mich 359, 417; 630 NW2d 297 (2001) (WEAVER, J., dissenting).

[16] 1 Cooley, Constitutional Limitations (8th ed), p 131-132.

reason that Justice COOLEY concluded that "[n]o satisfactory definition of the term 'public use' has ever been achieved *by the courts.*"[17]

II.   The People's Common Understanding of "Public Use"

From the ordinance for government of the Northwest Territory of 1787 to the Michigan Constitution of 1963, every document governing the state of Michigan has recognized the sovereign's power of eminent domain.[18]   In 1852, this Court noted that "the whole policy of this country relative to roads, mills, bridges and canals, rests upon this single power [of eminent domain] . . . ."[19]   Thus, eminent domain has long been one of the "leading principles of government" that we must assume the people understood when they ratified each of Michigan's constitutions.[20]

---

[17] 2 Cooley, Constitutional Limitations (8th ed), p 1139-1140 (emphasis added).

[18] See, e.g., 1787 Gov't of Northwest Territory, art 2; 1805 Gov't of Michigan Territory, § 2; Const 1835, art 1, § 19; Const 1850, art 15, § 9 and art 18, §14; Const 1908, art 13, §1 and § 5; and Const 1963, art 10, § 2.

[19] *Swan v Williams,* 2 Mich 427, 432 (1852), quoting Chancellor Walworth, 3 Paige R 73.

[20] 1 Cooley, Constitutional Limitations (8th ed), p 132.

While eminent domain is an attribute of sovereignty,[21] "public use" is a limitation on the exercise of the power of eminent domain. In every Michigan constitution, the voters of Michigan imposed a "public use" limitation on the exercise of the power of eminent domain.[22] To ascertain the people's understanding of art 10, § 2, it is to be remembered that:

> The primary source for ascertaining the meaning of a constitutional provision is to determined its plain meaning *as understood by its ratifiers at the time of its adoption*. This is so because "the constitution, although drawn up by a convention, derives no vitality from its framers, but depends for its force entirely upon the popular vote."
>
> Nevertheless, "to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered." This Court cannot properly protect the mandate of the people without examining both the origin and purpose of a constitutional provision, *because provisions stripped of their context may be manipulated and distorted into unintended meanings*. Indeed we *must heed the intentions of the ratifiers because our constitution gains its authority from its ratification by the people—to do otherwise deprives them of their right to govern*. [*Peterman v Dep't of Natural Resources,* 446 Mich 177, 184-185; 521 NW2d 499 (1994) (citations omitted; emphasis added).]

---

[21] *Sinas v City of Lansing,* 382 Mich 407, 411; 170 NW2d 23 (1969); *Swan, supra* at 431.

[22] Const 1835, art 1, § 19; Const 1850, art 15, § 9, §14; Const 1908, art 13, §1.

As clearly and fully expressed by this Court in *Peterman*, art 10, § 2, "has 'acquired a well-understood meaning, which the people must be supposed to have had in view in adopting them. We cannot understand these provisions unless we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense.'"[23]

To clarify the meaning understood by the ratifiers of art 10, § 2, *Peterman* cited an 1857 case discussing the power of and limitations on eminent domain and in a footnote provided the following historical context:

---

[23] *Peterman, supra* at 186 (quoting 1 Cooley, Constitutional Limitations (8th ed), p 132. The majority misuses *Peterman* to try to support the majority's elitist holding that art 10, § 2 must be interpreted as it would have been by person's "sophisticated in the law." Read in context above, *Peterman* squarely acknowledged that art 10, § 2 has acquired a well-understood meaning, which the people must be supposed to have had in view. That "public use" might be called a technical term or term of art does not remove it from the understanding of every person. The majority's perversion of the rule of common understanding is more than merely semantic. The majority's approach invites "sophisticated" refinement of the people's "right to govern" themselves through their popular vote. It allows the "sophisticated and learned in the law" to, intentionally or not, strip constitutional provisions of their context and manipulate and distort their meaning. See, e.g., *Peterman, supra* at 185.

Before the American Revolution and the drafting of the United States Constitution, the sovereign was not only empowered to take private property for public use, but such takings were almost always uncompensated. . . . Nevertheless, the newly formed republic became increasingly hostile to governmental infringement of property rights as states seized loyalist lands, suspended or remitted debts and the collection of taxes, printed inflationary paper money, and delayed legal enforcement of property rights. To address these abuses was born the requirement that government may not take private property for public use without just compensation. [*Id*. at 187 n 14.]

Such historical perspective helps clarify the limitations on the exercise of eminent domain intended by the ratifiers. *Peterman's* approach is entirely distinct from the majority's reliance on the "sophisticated" understanding of case law addressing the public use limitation. *Peterman's* commitment to ascertaining the common understanding of the ratifiers stands in stark contrast to the majority's statement that the people's common understanding is "fictionalized." *Ante* at 31, n 48.

Determining whether a particular exercise of eminent domain is for a constitutionally permissible "public use" has traditionally and necessarily involved consideration of the use to which the condemned property will be put. In 1877, this Court held that to constitutionally exercise the power of eminent domain, the use must "be public in fact; in other words, that it should contain provisions entitling

17

the public to accommodations."[24]  Thus, this Court upheld the condemnation of land for the laying out of a public highway;[25] the condemnation of land for the opening of a public avenue;[26] a statute delegating condemnation authority to cities, villages, townships, and counties for the construction of airports;[27] and a public school district's condemnation of property for use by the school.[28]  In each of these cases the public retained the right to actually use the land.

A statute authorizing condemnation that merely requires the use of condemned property to generally serve the public interest is insufficient to justify the exercise of eminent domain authority because, "every lawful business does this."[29]  It is thus well-established that the "public use" requirement precludes the condemnation of property for

---

[24] *Ryerson v Brown*, 35 Mich 333, 338 (1877).

[25] *Rogren v Corwin*, 181 Mich 53; 147 NW 517 (1914).

[26] *In re Opening of Gallagher Ave*, 300 Mich 309, 312; 1 NW2d 553 (1942).

[27] *In re Petition of City of Detroit for Condemnation of Lands for Airport*, 308 Mich 480; 14 NW2d 140 (1944).

[28] *Union School Dist of the City of Jackson v Starr Commonwealth for Boys*, 322 Mich 165; 33 NW2d 807 (1948).

[29] *Ryerson, supra* at 339.

private use even if the private use will generally benefit the public.[30]

> "The public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and due protection to the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another, on vague grounds of public benefit, to spring from the more profitable use to which the latter may devote it. [*Portage Twp Bd of Health v Van Hoesen*, 87 Mich 533, 538; 49 NW 894 (1891), quoting Cooley, Const Lim (6th ed) p 654.]

This Court has held, therefore, that condemnation of land for a rail spur serving a single private company was an unconstitutional exercise of condemnation power because the private company could control its use and exclude the public.[31] Similarly, this Court has held that a statute authorizing condemnation of property to provide a private landowner access to his landlocked private property was unconstitutional.[32]

Ultimate private ownership of lands proposed for condemnation, however, does not necessarily render the taking of land unconstitutional under the "public use" requirement. This Court has upheld the exercise of eminent

---

[30] See, e.g., *Pere Marquette R Co v United States Gypsum Co,* 154 Mich 290; 117 NW 733 (1908).

[31] *Pere Marquette, supra* at 300.

[32] *Tolksdorf v Griffith*, 464 Mich 1, 9; 626 NW2d 163 (2001).

domain involving lands that remain in private ownership (albeit new private ownership) where the public retains the right to use the lands taken.

> In every instance of turnpike, plank road, bridge, ferry, and canal companies, [eminent domain] has been employed, as well as those of railroads. All this class of incorporations have been enacted upon the hypothesis that the lands taken for these purposes were taken for *public use*, and not for private endowment . . . . The right to purchase and hold lands for the purposes of the road, being a right delegated in virtue of the eminent domain of the government, and derogatory to those of the citizen whose property is condemned, must be construed as conferring no right to hold the property in derogation of the purposes for which it was taken. [*Swan, supra* at 439-440 (emphasis added).]

Thus, this Court upheld a statute providing for the appropriation of private property for a railroad designed to provide public travel[33] and a statute authorizing the condemnation of property for an interstate bridge available for public travel.[34] In these cases, ultimate private ownership of condemned land did not offend the "public use" limitation even though the owner would profit from its ownership, because the owner was and could be compelled to

---

[33] *Swan, supra. (Swan* involved the interpretation of the eminent domain provisions of the United States Constitution and the Ordinance of 1787 governing the Northwest Territory.)

[34] *Detroit International Bridge Co v American Seed Co*, 249 Mich 289; 228 NW 791 (1930).

continue to devote the condemned land to the public use for which it was condemned.[35]

While this Court's evaluation of whether a condemnation is for a "public use" has traditionally involved consideration of the public's use or control over the use of the property condemned, this Court has considered the government purposes to be achieved by the condemnation. For example, this Court held the transportation of oil throughout the state to be a valid legislative purpose and upheld the constitutionality of a statute allowing the condemnation of lands for a pipeline to serve that purpose.[36] There the Court concluded, however, that the pipeline was a "public use benefiting the people of the State of Michigan" and emphasized that the state retained control of the pipeline allowing it to ensure its devotion to public use.[37] The Court has also excused the absence of ultimate public use or control over lands taken and then transferred to a private entity in cases involving the removal of slums and blight that

---

[35] *Swan, supra* at 436, and *Detroit International Bridge Co, supra* at 299.

[36] *Lakehead Pipe Line Co, Inc v Dehn*, 340 Mich 25, 36; 64 NW2d 903 (1954).

[37] *Id.* at 37 and 40.

21

endangered public health, morals, safety, and welfare.[38]  In these cases, the Court reasoned that "slum clearance is in any event the one *controlling* purpose of the condemnation."[39]

Until *Poletown*, this Court's decisions consistently distinguished "public use," as that concept limits the exercise of eminent domain, from private uses and uses that only generally advance the public interest.  This distinction was readily traceable in the law and must be assumed to have been well understood by Michigan citizens, the vast majority of whom are not lawyers and are not "sophisticated in the law."  The distinction between a "public use" and uses that are strictly private or only generally beneficial to the public protects against the arbitrary exercise of the "extraordinary" sovereign power of eminent domain.[40]

Wayne County's purpose supporting each of the condemnation proceedings at issue is the creation of a contiguous land mass of approximately 1,300 acres for the

---

[38] See, e.g., *In re Slum Clearance,* 331 Mich 714; 50 NW2d 340 (1951), *Sinas v City of Lansing*, 382 Mich 407; 170 NW2d 23 (1969), and *City of Center Line v Michigan Bell Tel Co*, 387 Mich 260; 196 NW2d 144 (1972).

[39] *In re Slum Clearnace, supra* at 72 (emphasis in original).

[40] *Swan, supra* at 433.

development of the Pinnacle Aeropark Project. The county states that contiguity is necessary to attract investors and further that the development will create thousands of jobs and tens of millions of dollars in tax revenue, while broadening its primarily industrial tax base.

However laudable these goals are, the facts remain that Wayne County intends to transfer these properties to private entities. These entities will be under no obligation to let the public in their doors or even on their lands. There is no way to characterize the county's transfer of dominion over these properties as accommodating "public use." Further, Wayne County will not retain control over the properties or enterprises to ensure their devotion to public use. Nor can it be said that a controlling purpose of the condemnations is the removal of blight or slums that endanger the public health, morals, safety, and welfare. This case is indeed a very straightforward example of government taking one person's property for the sole benefit of another.

III. The Majority Abandons the Common Understanding

The majority's application of its "sophisticated in the law" approach to this case is unnecessary and subject to abuse: it invites the erosion of the limitations placed on the exercise of eminent domain. As noted by Justice

COOLEY, "[a] little investigation will show that any definition [of 'public use'] attempted would exclude some subjects that properly should be included in, and include some subjects that must be excluded from, the operation of the words 'public use' . . . ."[41] Nevertheless, the majority opines that

> transfer of condemned property to a private entity, seen through the eyes of an individual sophisticated in the law at the time of ratification of our 1963 Constitution, would be appropriate in one of three contexts: (1) where 'public necessity of the extreme sort' requires collective action; (2) where the property remains subject to public oversight after transfer to a private entity; and (3) where the property selected is due to "facts of independent public significance," rather than the interests of the private entity to which the property is eventually transferred. [42]

The majority's categorization of Michigan case law addressing transfers of property to private entities is better suited to articles in law journals that have no force of law than it is to judicial opinions. If, instead of the common understanding of "public use," future courts rely on "facts of independent public significance" to determine whether a condemnation is for a "public use," then it is easy to imagine how the people's limit on the

---

[41] 2 Cooley, Constitutional Limitations (8th ed), p 1139-1140.
[42] *Ante* at 39 (citing *Poletown, supra,* at 674-681 (RYAN, J., dissenting)).

exercise of eminent domain might be eroded.  For example, a municipality could declare the lack of a two-car garage to be evidence of blight, as has been attempted in Lakewood, Ohio[43] or justify condemning a small brake repair business so that the property can be used for a hardware store, as has been attempted in Mesa, Arizona.[44]  The majority's "sophisticated in the law" approach makes the intended protections from such encroachments on protected rights less certain because it moves away from the constitutional text.

The majority's categories are based on what the majority has determined is the "sophisticated" understanding of case law.  However, "sophisticated" categorizations should not replace the traditional approach to ascertaining the common understanding of the ratifiers.  Justice COOLEY aptly summarized the "public use" limitations as follows:

> [T]he *public use* implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies; and due protection to the rights of private property will preclude the government from seizing it in the hands of the owner, and turning it over to another on vague grounds of public benefit to

---

[43] Engage, *Berman and Beyond:  The Misuse of Blight Laws and Eminent Domain*, (Vol 5, Issue 1).  See also, CBS News, *60 Minutes,* September 28, 2003.

[44] CBS News, *60 Minutes,* September 28, 2003.

spring from the more profitable use to which the latter may devote it.

We find ourselves somewhat at sea, however, when we undertake to define, in the light of the judicial decisions, what constitutes a public use.[45]

Justice COOLEY's scholarly treatise follows this statement with a review of judicial decisions from various states regarding the meaning of "public use" and concludes that "public use" "has a meaning much controlled by necessity, and somewhat different from that which it generally bears."[46]

Contrary to the majority's suggestion, Justice Cooley does not justify invoking a cadre of legal "sophisticates" to help ascertain the meaning of "public use," rather it reveals that "public use" is indeed a constitutional term that must be understood not in its "more popular character," but rather in "the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights."[47]  The sense

---

[45] 2 Cooley, Constitutional Limitations (8th ed), p 1129.

[46] *Id* at 1138.

[47] 1 Cooley, Constitutional Limitations (8th ed), p 132-133.  A more "popular" sense of "public use" might be derived by concluding that the term required the public's actual physical use of the land or by combining lay dictionary definitions of "public" and "use."  These

26

fixed upon the term in legal and constitutional history is, in Justice COOLEY's words, "familiar to the people."[48]

The facts of each case involving a proposed condemnation should be considered in light of the "public use" limitation on the exercise of eminent domain as the limitation would have been commonly understood by the people, learned and unlearned, who ratified the Constitution. This ensures that the "sense fixed upon the words in the legal and constitutional history" continue to serve to protect the "popular rights."[49]

Contrary to the majority's suggestion, the people's common understanding is not "fictionalized." *Ante* at 31, n 48. The people who ratified art 10, § 2 do understand the limitations they imposed on the exercise of eminent domain. As stated by Justice Cooley:

> it is always an invasion of liberty and of right when one is compelled to part with his possessions on grounds which are only colorable. A person may be very unreasonable in insisting on retaining his lands; but half the value of free institutions consists in the fact that they protect every man in doing what he shall choose,

definitions would not necessarily reflect the full protections intended by the ratifiers of art 10, § 2 when they limited the exercise of eminent domain.

[48] 1 Cooley, Constitutional Limitations (8th ed), p 132.

[49] 1 Cooley, Constitutional Limitations (8th ed), p 132-133.

without liability to be called account for his reasons or motives, so long as he is doing only that which he has a right to do. [*Ryerson, supra* at 342.]

Nevertheless, the majority substitutes the people's common understanding with that of those "sophisticated in the law." Apparently, the current majority does not share Justice COOLEY'S respect for every person's understanding of their most basic and established constitutional protections.

## IV. Conclusion

I agree with the majority's result and its decision to overrule *Poletown. Poletown* wrongly abandoned the express constitutional limitation on the exercise of eminent domain power when it held that land can be taken by the government and transferred to a private entity upon the mere showing that the economy will generally benefit from the condemnation. For the reasons stated by the majority, I agree that this decision should apply retroactively. Thus Wayne County may not condemn the properties of the defendants at issue.

I dissent from the majority's reliance on its recently created and elitist rule of constitutional interpretation that gives constitutional terms the meaning that those

28

"versed" and "sophisticated in the law" would have given it at the time of the Constitution's ratification.

I also dissent from the majority's application of this new rule to the facts of this case. While the majority's application of its method of interpretation reaches the correct result in this case, this new rule of constitutional interpretation perverts the long-established and primary rule that constitutional terms are to be interpreted as they are understood by the citizen ratifiers, the vast majority of whom are not lawyers or judges and are not "sophisticated in the law." The majority's new rule of constitutional interpretation opens the door, as Justice Cooley warned, for "interested subtlety and ingenious refinement" to be forced on the Constitution's language—constitutional language that the people framed and adopted for themselves "as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."[50]

Where a legal and constitutional term is so embedded in our constitutional law and history and so familiar to the people as to be commonly understood, this Court should not redefine it through the eyes of those "sophisticated in

---

[50] 1 Cooley, Constitutional Limitations (8th ed), p 131-132.

the law," but should give it the common understanding that the people who ratified the Constitution would have given the term.

Elizabeth A. Weaver

CAVANAGH, J.

I concur only with respect to section I.

Michael F. Cavanagh

S T A T E   O F   M I C H I G A N

SUPREME COURT

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                          No. 124070

EDWARD HATHCOCK,

    Defendant-Appellant.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                          No. 124071

AARON T. SPECK and DONALD E. SPECK,

    Defendants-Appellants.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                          No. 124072

AUBINS SERVICE, INC AND DAVID R.
YORK, Trustee of the DAVID R. YORK
REVOCABLE LIVING TRUST,

    Defendants-Appellants.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                                    No. 124073

JEFFREY J. KOMISAR,

    Defendant-Appellant.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                                    No. 124074

ROBERT WARD and LELA WARD,

    Defendants-Appellants,

and

HENRY Y. COOLEY,

    Defendant.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                                    No. 124075

MRS. JAMES GRIZZLE and MICHELLE
A. BALDWIN,

    Defendants-Appellants,

and

RAMIE FAKHOURY

    Defendant.

_____

COUNTY OF WAYNE,

Plaintiff-Appellee,

v                                                    No. 124076

STEPHANIE A. KOMISAR,

    Defendant-Appellant.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                                    No. 124077

THOMAS L. GOFF, NORMA GOFF, MARK
A. BARKER, JR., and KATHLEEN A. BARKER,

    Defendants-Appellants.

_____

COUNTY OF WAYNE,

    Plaintiff-Appellee,

v                                                    No. 124078

VINCENT FINAZZO,

    Defendant-Appellant,

and

AUBREY L. GREGORY and DULCINA
GREGORY,

    Defendants.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

3

I concur with the majority that *Poletown Neighborhood Council v Detroit*, 410 Mich 616; 304 NW2d 455 (1981), should be overruled. I also concur with section I of Justice Weaver's partial concurrence and partial dissent. I write separately, however, because I believe that the analysis offered by Justice Ryan in his dissent in *Poletown* offers the best rationale to explain why I believe *Poletown* should be overruled. Further, I dissent from the majority's conclusion that today's decision should be applied retroactively. Contrary to the majority, I would apply today's decision prospectively only.

This Court has determined that various factors must be considered when determining whether a decision should have retroactive application. In *Pohutski v City of Allen Park*, 465 Mich 675, 696; 641 NW2d 219 (2002), this Court stated that these "factors are: (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice." This Court also "recognized an additional threshold question whether the decision clearly established a new principle of law." *Id*. Further, this Court has adopted a thoughtful approach to retroactivity to minimize chaos and maximize justice. See *Tebo v Havlik*, 418 Mich 350, 360, 361, 363; 343 NW2d 181 (1984) (opinion by

4

Brickley, J.; *Lindsey v Harper Hosp*, 455 Mich 56, 68; 564 NW2d 861 (1997) ("Prospective application of a holding is appropriate when the holding overrules settled precedent . . . .").

The key factors in this case are Wayne County's reliance on this Court's decision in *Poletown* and the effect retroactive application will have on Wayne County, as well as other communities that relied on *Poletown*. In brief, Wayne County has spent approximately $50 million on the project at issue in this case in reliance on this Court's decision in *Poletown*. While I agree with the majority that *Poletown* improperly interpreted and applied the law, Wayne County's reliance on this Court's decision in *Poletown* is clear and I do not believe that Wayne County and its taxpayers should be penalized because the county followed this Court's guidance.

The majority states that "Wayne County's course of conduct in the present case was no doubt shaped by *Poletown*'s disregard for constitutional limits on the exercise of the power of eminent domain and the license that opinion *appeared to* grant to state and local authorities." *Ante* at 48 (emphasis added). The *Poletown* opinion did not *appear* to grant power to state and local authorities, it actually did so. Although we now overrule

5

*Poletown* because it incorrectly interpreted our Constitution, there is no doubt that Wayne County's actions were a direct result of this Court's decision in *Poletown* and were proper under the reasoning and holding in that decision.

I understand that prospective application would mean that defendants must accept just compensation in exchange for their properties. In an ideal situation, no one, including defendants, would have to sell property unless they wanted to sell. However, in examining the factors that this Court considers when determining whether a decision should have retroactive application, I cannot penalize Wayne County and its taxpayers because the county followed this Court's prior direction. Therefore, while I concur with the majority in overruling *Poletown*, I dissent with respect to the retroactive application of the majority's decision.

Michael F. Cavanagh
Marilyn Kelly